## PETERS v. BAIN.

## GRIFFIN v. PETERS.

APPEALS FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE EASTERN DISTRICT OF VIRGINIA.

Nos. 87, 198. Argued November 7, 8, 1889. — Decided March 3, 1890.

This court accepts the construction given to a state statute against fraudulent conveyances by the highest court of the State as controlling.

It is settled law in Virginia that an assignment by a debtor for the benefit of creditors will not be declared void, as given "with intent to delay, hinder or defraud creditors, purchasers," etc., unless such an inference is so irresistible as to preclude any other; that the fact that creditors may be delayed or hindered, is not, of itself, sufficient to vacate the instrument; and that one creditor may be preferred over another.

When an assignment for the benefit of partnership and individual creditors includes all the property of the grantors as partners and individually, it should be construed distributively, partnership assets being applied to the payment of partnership debts, and individual assets to individual liabilities.

As respects fraud in law, as distinguished from fraud in fact, in a conveyance, if that which is invalid can be separated from that which is valid,

without defeating the general intent, the maxim "void in part, void *in toto*" does not necessarily apply, but the instrument may be sustained notwithstanding the invalidity of a particular provision.

An assignment for the benefit of creditors, with preferences, authorized the trustees to "make sale of the real and other personal estate hereby conveyed, at public auction or private sale, at such time or times, and place or places, and after such notice as to them shall seem best, and they may make such sale upon such terms and conditions as to them shall seem best, except that at any sale of said property, real or personal, at public auction, any creditor secured by this deed in the second class above enumerated shall have the right to purchase any part or parcel of said property so sold, and pay the said trustees therefor, at its full face value, the amount found due such purchaser secured by this deed, or so much thereof as may be necessary to enable such creditor to complete the payment of his purchase money, and to enable as many creditors as possible to become bidders on these terms, the said trustees may have the real estate hereby conveyed, or any part thereof, laid off into lots or parcels, as they may think best;" *Held*, that the deed was not void in law because of the insertion of this provision.

The individual members of a private banking house, who were also the controlling directors in a national bank, made an assignment of their property for the benefit of creditors, which assignment was assailed as fraudulent in several matters, among which were alleged frauds upon the national bank, and frauds upon their own depositors previous to the assignment; *Held*, that violations of their fiduciary relations to the bank, or their treatment of their own depositors did not render the assignment of all their property for the benefit of their creditors, fraudulent for that reason.

The knowledge by a director and stockholder in a national bank that the bank is insolvent, does not invalidate an assignment of all his property for the benefit of his creditors, with preferences, made with such knowledge.

The court below was right in finding no evidence in thi case of a fraudulent intent on the part of the firm or either of its men bers to hinder and delay their creditors.

The individual partners in a private bank were also directors in a national bank, and, by reason of their position, became possessed of a large part of the means of the national bank which they used in their own business. They assigned all their property to trustees for the benefit of their creditors. The national bank also suspended, and went into the hands of a receiver; *Held*,

(1) That the receiver was entitled to the surrinder of such of the property as had been actually purchased with the moneys of the bank as he might elect; but that purchases made and paid for out of the general mass could not be claimed by the receiver unless it could be shown that moneys of the bank in the general fund at the time of the purchase, were appropriated for that purpose.

(2) That the receiver was not estopped by such election and taking, from receiving the full benefit of the deed of trust in favor of the national bank.

In Virginia, trustees and beneficiaries in a deed of trust to secure *bona fide* debts occupy the position of purchasers for a valuable consideration.

When the counsel of an insolvent debtor draws an assignment of his client's property to himself as trustee for the benefit of creditors, he may be presumed to have had knowledge of the dealings of the insolvent with his creditors.

Under the circumstances of this case a decree directing the payment of the costs of suit out of the trust fund is correct.

THESE were appeals from a final decree of the Circuit Court of the United States for the Eastern District of Virginia, entered on the 15th day of June, 1886, upon a bill in equity brought by William H. Peters, receiver of the Exchange National Bank of Norfolk, against Robert T. K. Bain, George M. Bain, Jr., and James G. Bain, late partners under the name and style of Bain & Brother, survivors of themselves and Thomas A. Bain, deceased; and John T. Griffin, William W. Old and John B. Jenkins, trustees under a deed of assignment from Bain & Brother; and upon a cross-bill filed by said trustees. The cause, after having been brought to issue, was referred to a special master, who took evidence and reported thereon, and was heard by Mr. Chief Justice Waite and the circuit judge.

The opinion of the court was delivered by the Chief Justice, and was as follows:

"This is a suit in equity begun by the receiver of the Exchange National Bank of Norfolk, an insolvent national bank, for a two-fold purpose, that is to say: 1, to set aside an assignment made by the partnership firm of Bain & Bro. and the several members thereof for the benefit of their creditors, and to subject the assigned property to the payment of debts due the bank; and, 2, to charge property in the hands of the assignees with the trust in favor of the bank because it was bought with moneys of the bank, which certain members of the firm, who were officers of the bank, had wrongfully used for that purpose.

"The material facts are these: The Exchange National Bank

was organized May 13, 1865, with a capital of $100,000, which was increased November 13, 1866, to $150,000. Its place of business was Norfolk, Va.

"The firm of Bain & Bro., composed originally of R. T. K. and James G. Bain, began business in Portsmouth, Va., as brokers and private bankers in September, 1865, with an assumed capital of $5000, placed to the credit of the two partners on the books. George M. Bain, Jr., was admitted as a partner soon after the business was started and Thomas A. Bain in 1868 or 1869; but he died in 1877. The capital was never increased, but, on the contrary, the drafts of the partners soon exhausted the original credits and much more besides. At the time of the failure, the balances against the partners respectively were as follows:

| | |
|---|---:|
| "James G. Bain | $54,796 73 |
| "R. T. K. Bain | 47,369 23 |
| "George M. Bain, Jr. | 7,146 39 |
| "Thomas A. Bain's estate | 20,028 41 |
| "In all | $129,340 76 |

"Portsmouth is separated from Norfolk by the Elizabeth River; one place being on one side of the river and the other immediately opposite on the other. On the 7th of July, 1870, the firm became shareholders in the bank, and the next day George M. Bain, Jr., was elected cashier. This office he held until April 2, 1885. R. T. K. Bain was elected a director January 2, 1872, and he served in that capacity all the time thereafter during the existence of the bank. James G. Bain was elected assistant cashier August 11, 1873, and he held that office until January 11, 1881, when he was made vice-president, in which capacity he acted until the end. Thomas A. Bain was elected a director January 11, 1876, and this office he held until his death.

"On the 9th of September, 1873, the capital stock of the bank was increased from $150,000 to $200,000. The names of the subscribers are not given and no money was paid on that day, but the whole amount of $50,000 was carried in the

receiving teller's cash as a cash item until October 14, 1873, when the following parties gave their checks on the bank for the following amounts:

| | |
|---|---:|
| " Bain & Bro. | $25,000 |
| " John B. Whitehead | 15,000 |
| " James H. Toomer | 5,000 |
| " George M. Bain, Jr. | 5,000 |
| " In all | $50,000 |

" Certificates of stock were issued to these parties, respectively, for the shares represented by their several checks. On the 10th of May, 1874, the stock was increased to $300,000, R. H. McDonald, of California, taking and paying for the whole of the additional amount.

" At the time of the failure of the bank the following persons held shares as follows:

| | | |
|---|---:|---|
| " Bain & Bro. | 582 | shares. |
| " George M. Bain, Jr. | 232 | do. |
| " James G. Bain | 91 | do. |
| " R. T. K. Bain | 91 | do. |
| " Thos. A. Bain's estate | 91 | do. |
| " George M. Bain, Jr., and John B. Whitehead | 100 | do. |
| " In all | 1187 | do. |

" Very soon after Bain & Bro. became connected with the bank they began to absorb its funds. As they wanted money they got it with or without security, as was most convenient for them. They had no direct connection in their own private banking business with the Bankers' Clearing-house at Norfolk, but they were represented in that association by the Exchange Bank, which paid all balances against them, and these at some times amounted to very large sums. The commercial and business paper which they took at their banking-house in Portsmouth was largely rediscounted for them at the bank, and on the 31st of March, 1885, their indebtedness to the bank has been stated approximately as follows:

" Bain & Bro.'s notes &c., unendorsed and unse-
    cured . . . . . . . . . . . . . $800,000 00
" Notes of others endorsed by them . . . . .   593,251 99
" Cash tickets . . . . . . . . . . . . .          211 00
"Bain & Bro.'s notes endorsed by bank and dis-
    counted in New York . . . . . . . .         50,000 00
                                              ─────────────
        " In all . . . . . . . . . .  $1,443,462 99

. " In addition to this George M. Bain, Jr., and James G. Bain
each owed the bank very considerable sums. Such being the
condition of affairs, the Comptroller of the Currency required
the bank to reduce at once the unsecured debt of Bain & Bro.,
and to make good the deficiency in its reserve fund. In con-
sequence of this the firm on the 31st of March sold to the
bank the following stocks and bonds :

" Seaboard Compress Company stocks . . . . . . $300,000
" Meherrin Valley railroad bonds . . . . . . .  200,000
" Southern telegraph bonds, of the par value of
    $140,000, at . . . . . . . . . . . . .       70,000
                                              ─────────────
        " In all . . . . . . . . . . . . . $570,000

and guaranteed that the same should yield the amount for
which they were taken whenever put on the market and sold.
This guaranty was secured by a transfer of the interest of the
firm in the Richmond Cedar Works, and also in $80,000 of
Southern telegraph bonds held as collateral security. This
being done, and the firm also agreeing not to assign their
other property for the benefit of creditors with preferences
against the bank, notes of the firm and other indebtedness to
the amount agreed on as the value of the stocks and bonds
were surrendered and the unsecured debts thereby nominally
reduced. While some of the stocks and bonds thus trans-
ferred had been before that time in the possession of the bank,
or some of its officers, the evidence does not establish the fact
that they had been in any way pledged, or that they could be
legally held by the bank as security. They were all, so far as
appears, the property of the firm, free of any specific claim of

the bank. The value of the stocks and bonds thus transferred falls between two and three hundred thousand dollars short of the amount for which they were taken, and the Richmond Cedar Works stock and Southern telegraph bonds, held as collateral to the guaranty against this deficiency, are of but little value.

"What was thus done did not satisfy the Comptroller, and on the 2d of April, 1885, he took possession of the bank for the purpose of winding up its affairs. The banking-house in Portsmouth closed its doors at the same time. This produced great excitement both in Portsmouth and Norfolk, and resulted in the assignment which is now attacked. Mr. Old, one of the assignees, is an attorney-at-law, and was retained as counsel for the firm. He advised them in all their matters and drafted the assignment. He was informed of the agreement which had been made not to assign with preferences against the bank, and knew generally of the large indebtedness of the firm and of its members to the bank. He also knew of the transaction between the bank and the firm on the 31st of March, and, hearing that it was the intention of the creditors of the bank to enjoin the assignment, he made haste to have it executed and recorded before anything of that kind was done.

"The actual value of the property which passed by the assignment does not exceed five hundred thousand dollars. The property consists very largely of real estate in Portsmouth and Norfolk County, the title to most of which was in R. T. K. Bain. The books of the firm are entirely unreliable. In fact, no general ledger was ever kept, and transactions to enormous amounts can only be traced by memoranda on slips of paper with the help of the explanations of R. T. K. Bain, who was the principal manager. No accounts at all were kept with the bank, and everything, so far as Bain & Bro. were concerned, was found in the greatest confusion.

"After the death of Thomas A. Bain the business of the firm was conducted in all respects as it had been before. The indebtedness of the firm to depositors and otherwise at the time of the failure has not been accurately determined, but

claims of depositors have already been proved against the trust to more than $750,000, and it is not unlikely that the entire indebtedness, other than that to the bank, may approach a million of dollars.

"The money received by the firm from the bank was generally mingled with that which was got from other sources, and it has been impossible to trace it directly into property now in the hands of the assignees, except in the following cases:—

### "Real Estate.

"1. Inventory No. 22, bought May, 1876 . . . $650 00
"2. Inventory No. 50, bought September, 1881 . 500 00
"3. Inventory No. 58, bought April, 1884 . . . 1,137 45
"4. Inventory Nos. 65, 66, 67, bought August, 1881, and October, 1882, $768.34 and $1865.16 . . . . . . . . . . . 2,633 50

### "Colorado Mines.

"5. Boomerang, bought August 30, 1884 . . . 16,333 00
"6. Laura Dunmore, bought August 4, 1884 . . 5,000 00

### "Personalty.

"7. Dismal Swamp canal bond, bought December, 1880 . . . . . . . . . . . . . . . 2,100 00
"8. Seaboard and Roanoke Railroad Co.'s stock, 1 share, bought about 1879 . . . . . . . 90 00
"9. Ocean View Railroad and hotel stock, 122 shares, bought October, 1880 . . . . . 6,100 00
"10. Chesapeake and Idaho Gold and Silver Mining Co.'s stock, 625 shares, bought after 1881 . 7,812 00
"11. Guano 'ex. Mt. Edgecomb,' paid for by Exchange National Bank, February 15, 1884, $59,725.97, part thereof on hand April 6th, 1885, and other parts in open accounts due for sales thereof . . . . . . . . . . 15,034 51
"12. Norfolk and Ouray Mining Co.'s stock, 6114 shares, whereof the assignees hold 3602 shares, which cost $25 per share . . . . 90,050 00
"13. Personal estate of Jas. G. Bain . . . . . 1,931 25

" 1. As to the trust resulting to the bank by reason of the wrongful and unlawful use of its funds by its officers in the purchase of property for the firm or the several members thereof, this branch of the case divides itself into two parts, the first relating to property which was purchased with moneys that can be identified as belonging to the bank; and, second, to that which was bought and paid for by the firm out of the general mass of moneys in their possession, and which may or may not have been made up in part of what had been wrongfully taken from the bank.

" As to the first of these classes of property we entertain no doubt that the trust exists, and that it may be enforced by the receiver unless the assignees of Bain & Bro. occupy the position of *bona fide* purchasers for a valuable consideration without notice.    The evidence shows beyond doubt that the affairs of the bank were managed almost exclusively by the members of the firm.    The funds of the bank were under the immediate control of its officers and agents, and consequently as its trustees.    These funds were converted by them regardless of their duty as trustees into this particular property, which still exists in specie.    No money was used in these purchases other than such as was taken directly from the bank for that purpose.    Under these circumstances the property stands in the place of the money used, and it might have been reclaimed by the bank at its election any time before the rights of innocent third parties intervened.    This is elementary.    The receiver succeeded to the rights of the bank in this particular.

" The property in the second class, however, occupies a different position.    There the purchases were made with moneys that cannot be identified as belonging to the bank. The payments were all, so far as now appears, from the general fund then in the possession and under the control of the firm.    Some of the money of the bank may have gone into this fund, but it was not distinguishable from the rest.    The mixture of the money of the bank with the money of the firm did not make the bank the owner of the whole.    All the bank could in any event claim would be the right to draw out of the general mass of money, so long as it remained money, an

amount equal to that which had been wrongfully taken from its own possession and put there. Purchases made and paid for out of the general mass cannot be claimed by the bank, unless it is shown that its own moneys then in the fund were appropriated for that purpose. Nothing of the kind has been attempted here, and it has not even been shown that when the property in this class was purchased, the firm had in its possession any of the moneys of the bank that could be reclaimed in specie. To give a *cestui que trust* the benefit of purchases by his trustees, it must be satisfactorily shown that they were actually made with the trust funds.

" In Virginia an assignee for the benefit of creditors is deemed a purchaser for a valuable consideration. This, it is conceded, has been established by a long line of judicial decisions, and is now a rule of property in that State. As such it is binding on us as authority, but, we think, in this case the assignees are chargeable with notice of the equities of the bank. They may not have had actual knowledge of the wrongful conversion of the moneys of the bank into the property which has now been identified as such, but it is clear that Mr. Old, who alone of the assignees was present during the negotiations which preceded the assignment, had full notice of the confusion which existed in the affairs of the bank, as well as those of the firm, and of the intimate relations which for a long time existed between the two institutions. The assignment was hastened to prevent further complications, and we have no hesitation in holding that the assignees took title subject to any equities that might be found to exist in favor of the bank. They were put on inquiry, which they avoided to save what they could. Under these circumstances we hold that the receiver is entitled to a surrender by the assignees of such of the property which it is found had actually been purchased with the moneys of the bank as he elects to take, but of no other.

" 2. As to the assignment. By a statute of Virginia, a creditor may file a bill to set aside a conveyance by his debtor on the ground of fraud without having first obtained a judgment. This suit was, therefore, properly brought. We find

no evidence whatever, of any actual fraudulent intent on the part of the firm, or either of the partners, to hinder and delay their creditors. They devoted all their property, partnership and individual, of every kind to the payment of their debts. Nothing whatever was kept back. It is true some creditors were preferred over others, but this is allowable in Virginia. From the case of *Skipwith's Executor* v. *Cunningham*, 8 Leigh, 271, decided in 1837, until now, such has been the recognized law of the State, and this was conceded in the argument.

" It is a matter of no importance in this connection that the debt to the bank was created by fraud, or that the assignors were shareholders in the bank and liable, as such, to assessments by the Comptroller of the Currency to meet its debts. Fraud in the creation of an unpreferred debt is not ground for setting aside an assignment for the benefit of creditors which is otherwise valid, and the shareholder of an insolvent bank is no more prohibited from preferring creditors as against his liability in that capacity, than he is as against any one else that he owes. The assignment does not in any respect change the liability of the shareholders; that was fixed on the failure of the bank before the transfer was made. As has already been shown, so much of the property assigned-as is charged with a trust in favor of the bank can be reached in the hands of the assignees. The promise not to assign with preferences against the bank does not of itself avoid such an assignment for fraud.

" It is claimed, however, that the deed is fraudulent and void on its face — 1, because it appropriates partnership assets to the payment of individual debts, in preference to the debts of the partnership; and, 2, because of the peculiar provision which is made for bidding by the creditors of the second class at any public sale that may be made of the assigned property.

" As to the first of these objections it is sufficient to say that as early as 1837 the Supreme Court of Appeals of Virginia decided, in the case of *McCullough* v. *Sommerville*, 8 Leigh, 418, that a provision like that contained in this deed did not vitiate the assignment, but that a court of equity would, if required, so control the administration of the trust,

as to apply the partnership property to the payment of the partnership debts in preference to those of the individual partners, and the individual property to individual debts. This ruling was followed in *Gordon* v. *Cannon*, 18 Gratt. 387, decided in 1868, and its authority was recognized by all the judges, though there was some difference of opinion as to its applicability to the particular facts of the latter case. We see no reason to depart from what seems now to be the recognized rule of decision in the State, and we have no hesitation in saying that if there ever can be a case where such an assignment ought to be sustained it should be in this.

"The evidence discloses such a mingling of partnership and individual assets, and of partnership and individual debts, as to make it difficult in some cases to separate the one from the other. After a long and careful investigation of the whole matter, a separation may now have been made which approximates correctness, but when the assignment was made it is not probable that this could easily have been done. All the property, including that of the firm and that belonging to the several partners individually, has been put into the trust, and in the administration may, if necessary, be so marshalled as to prevent the creditors of the individual partners from getting an illegal advantage over those of the partnership, and *vice versa;* at any rate, we find nothing which, under the circumstances of this case, viewed in the light of the decisions of the highest court of Virginia, will render the whole assignment fraudulent and void as to the bank, and subject the property to the payment of its debt in preference to all others, as it is claimed should be done.

"It will be time enough to consider in what way the trust ought to be administered when a case is made for that purpose.

"This brings us to the consideration of the bidding clause of which complaint is made, and as to this it may be said there is no provision which can in any manner result to the advantage of the assignors in opposition to the creditors, for, until the creditors are all paid in full, the assignors can get nothing. If payment is made, it matters not to the creditors

how it is done. In no event can any but the first and second-class creditors be affected injuriously, and they are not here complaining. Although the bank is named as a creditor in each of the classes, the object of the present suit is, not to control the administration of this branch of the trust, but to set aside the assignment altogether.

"The only question we have now to consider, therefore, is whether this particular provision is fatal to the whole assignment. There is nothing, whatever, in the instrument to show that if it had been supposed this direction to the assignees could not legally be followed, the assignment would not have been made in its present form with this provision left out. On the contrary, everything looks the other way, for the assignees are authorized to sell at either public or private sale, according to their discretion, and it is only when the sale is public that the bidding clause becomes operative. The evident purpose was to stimulate bidding, not to give one creditor an unconscionable preference over another, nor to secure any special advantage to the assignors. It is not such an essential part of the scheme of the trust as to make it vital.

"At most it is a mere appendage which may be lopped off without injury to the main purpose of the instrument. Its only effect, so far as the deferred creditors are concerned, must be for their advantage, because the more the property sells for, the greater will be the chances of paying those preferred in full and leaving something for those who are unpreferred.

"No creditor can have an assignment for the benefit of creditors set aside at his suit, except it be on the ground that he has been defrauded. If this particular provision operates as a fraud upon those who are affected by it, relief can undoubtedly be had in some appropriate proceeding for that purpose, but that is not, as has been seen, the purpose of the present suit.

"Our conclusion is that the assignment is valid, but that the receiver is entitled to the surrender to him by the assignees of such of the property in their hands bought and paid for with the moneys of the bank as he elects to take."

A decree in accordance with the opinion was thereupon entered, and from it the receiver and the trustees respectively appealed.

The receiver assigned errors as follows : That the court erred (1) in refusing to set aside the deed of assignment of Bain & Bro. as fraudulent in fact ; (2) in failing to declare the assignment void because executed in fraud of sections 5151 and 5234 of the Revised Statutes of the United States ; (3) in holding that the receiver was entitled "to a surrender by the assignees of such of the property which it is found had actually been purchased with the moneys of the bank, but of no other ; " (4) in holding that the assignment " was made and executed without any actual fraudulent intent on the part of the said grantors or either of them to hinder and delay their creditors ; " (5) in holding "that the said deed of assignment is not fraudulent and void on its face."

The trustees assigned as error that the court erred (1) in finding that the trustees were to be considered as affected by constructive notice, as to certain of the property held by them, that it had been purchased with the money of the bank, and that the receiver was entitled to receive so much thereof as he elected to take, and was not, by making such election and receiving such property, estopped from receiving the benefit of the said deed of trust in favor of the Exchange National Bank ; (2) in the amount of property decreed to have been traced ; (3) in decreeing that as to property purchased with the money of the Exchange National Bank, and traced into such property, there was a resulting trust in favor of the bank, of which the trustees were to be considered as having had constructive notice ; (4) in decreeing that the costs of the suit be paid out of the trust funds in the hands of the trustees.

*Mr. Theodore S. Garnett* and *Mr. William J. Robertson,* for Peters, cited : *Russell* v. *Wynne,* 37 N. Y. 591 ; *S. C.* 97 Am. Dec. 755 ; *Grover* v. *Wakeman,* 11 Wend. 187 ; *S. C.* 25 Am. Dec. 624 ; *Upton* v. *Tribilcock,* 91 U. S. 45 ; *Sanger* v. *Upton,* 91 U. S. 56 ; *Bowden* v. *Santos,* 1 Hughes, 158 ; *Adler* v. *Milwaukee Brick Co.,* 13 Wisconsin, 57 ; *Hightower* v. *Thornton*,

Citations for Defendants in Error.

8 Georgia, 486; *S. C.* 52 Am. Dec. 412; *Frith* v. *Cartland,* 2 Hem. & Mill. 417; *Ward* v. *Griswoldville Mfg. Co.*; 16 Connecticut, 593; *Nevitt* v. *Bank of Port Gibson,* 6 Sm. & Marsh. 513; *Wood* v. *Dummer,* 3 Mason, 308; *Frelinghuysen* v. *Nugent,* 36 Fed. Rep. 229; *Pennell* v. *Deffell,* 4 DeG. M. & G. 372; *Knatchball* v. *Hallett,* 13 Ch. D. 696; *McLeod* v. *Evans,* 66 Wisconsin, 401, and cases cited; *Metzner* v. *Bauer,* 98 Indiana, 425; *National Bank* v. *Insurance Co.,* 104 U. S. 54; *Newman* v. *Cordell,* 43 Barb. 448; *Boardman* v. *Halliday,* 10 Paige, 223; *Barnum* v. *Hempstead,* 7 Paige, 568; *Averill* v. *Loucks,* 6 Barb. 470; *Sheldon* v. *Dodge,* 4 Denio, 217; *Strong* v. *Skinner,* 4 Barb. 546; *Kercheis* v. *Schloss,* 49 How. Pr. 284; *Hyslop* v. *Clarke,* 14 Johns. 458; *Seaving* v. *Brinkerhoff,* 5 Johns. Ch. 329; *Austin* v. *Bell,* 20 Johns. 442; *S. C.* 11 Am. Dec. 297; *Gasherie* v. *Apple,* 14 Abb. Pr. 64; *Brigham* v. *Tillinghast,* 15 Barb. 618; *S. C.* 13 N. Y. 215; *A. & W. Sprague Mfg. Co.* v. *Hoyt,* 29 Fed. Rep. 421; *Shanks* v. *Klein,* 104 U. S. 19; *Allen* v. *Withrow,* 110 U. S. 119.

*Mr. Richard Walke* and *Mr. James Alfred Jones,* (with whom was *Mr. Legh R. Page* on the brief,) for Griffin, Old, and Jenkins, trustees, cited: *Wickham* v. *Martin,* 13 Grattan, 427; *Evans* v. *Greenhow,* 15 Grattan, 153; *Garland* v. *Rives,* 4 Randolph, 282; *S. C.* 15 Am. Dec. 756; *Skipwith* v. *Cunningham,* 8 Leigh, 271; *S. C.* 31 Am. Dec. 642; *Lewis* v. *Caperton,* 8 Grattan, 148; *Phippen* v. *Durham,* 8 Grattan, 457; *Dance* v. *Seaman,* 11 Grattan, 778; *Sipe* v. *Earman,* 26 Grattan, 563; *Shurtz* v. *Johnson,* 28 Grattan, 657; *Williams* v. *Lord,* 75 Virginia, 390; *Gordon* v. *Rixey,* 76 Virginia, 694; *Foster* v. *Goddard,* 1 Black, 506; *McCullough* v. *Sommerville,* 8 Leigh, 415; *Gordon* v. *Cannon,* 18 Grattan, 387; *Cochran* v. *Paris,* 11 Grattan, 348; *Kevan* v. *Branch,* 1 Grattan, 274; *Brockenbrough* v. *Brockenbrough,* 31 Grattan, 580; *Young* v. *Willis,* 82 Virginia, 291; *Darling* v. *Rogers,* 22 Wend. 483; *Salmon* v. *Stuyvesant,* 16 Wend. 321; *Curtis* v. *Leavitt,* 15 N. Y. 9; *Parks* v. *Parks,* 9 Paige, 107; *Pigot's Case,* 11 Rep. 27; *Patterson* v. *Jenks,* 2 Pet. 215; *Mackie* v. *Cairns,* 5 Cowen, 547; *S. C.* 15 Am. Dec. 477; *Harrison* v. *Harrison,* 36 N. Y. 543; *Post* v. *Hover,*

30 Barb. 312; 33 N. Y. 593; *Gott* v. *Cook,* 7 Paige, 521; *De Peyster* v. *Clendining,* 8 Paige, 295; *Van Vechten* v. *Van Vechten,* 8 Paige, 103; *Gilman* v. *Redington,* 24 N. Y. 9; *Everitt* v. *Everitt,* 29 N. Y. 39; *Kane* v. *Gott,* 24 Wend. 641; *S. C.* 35 Am. Dec. 641; *Williams* v. *Williams,* 4 Selden (8 N. Y.) 524; *Van Schuyver* v. *Mulford,* 59 N. Y. 426; *Manice* v. *Manice,* 43 N. Y. 303; *Denny* v. *Bennett,* 128 U. S. 489; *United States* v. *Bradley,* 10 Pet. 343; *Gregory* v. *Gates,* 30 Grattan, 83; *Dixon* v. *McCue,* 14 Grattan, 540; *Wilson* v. *Townshend,* 2 Ves. Jr. 693; *Watson* v. *Watson,* 128 Mass. 152; *Chapin* v. *Thompson,* 89 N. Y. 270; *Smith* v. *Smith,* 14 Gray, 532; *Brown* v. *Brown,* 108 Mass. 386; *Hapgood* v. *Houghton,* 22 Pick. 480, 483; *Doe* v. *Cavendish,* 3 Doug. 48, 55; *S. C.* 4 T. R. 741, 743, note; *Birmingham* v. *Kirwan,* 2 Sch. & Lef. 444, 450.

MR. CHIEF JUSTICE FULLER, after stating the case as above, delivered the opinion of the court.

The opinion of the late Chief Justice clearly delineates the grounds upon which the Circuit Court proceeded and minimizes our labors in the disposition of this case.

The deed of assignment was attacked as fraudulent in law and in fact.

The statute of Elizabeth, c. 5, against fraudulent conveyances has been universally adopted in American law as the basis of our jurisprudence on that subject, (Story Eq. Jur. § 353,) and reënacted in terms, or nearly so, or with some change of language, by the legislatures of the several States.

In Virginia the statute reads as follows: "Every gift, conveyance, assignment, or transfer of, or charge upon any estate, real or personal, every suit commenced, or decree, judgment, or execution suffered or obtained, and every bond or other writing given with intent to delay, hinder, or defraud creditors, purchasers, or other persons of or from what they are or may be lawfully entitled to, shall, as to such creditors, purchasers, or other persons, their representatives or assigns, be void. This section shall not affect the title of a purchaser for valuable consideration, unless it appear that he had notice of

the fraudulent intent of his immediate grantor or of the fraud rendering void the title of such grantor." Virginia Code, 1873, 896, c. 114, § 1.

In controversies arising under this statute, involving, as they do, the rights of creditors locally, and a rule of property, we accept the conclusions of the highest judicial tribunal of the State as controlling. *Jaffray* v. *McGehee*, 107 U. S. 361, 364; *Lloyd* v. *Fulton*, 91 U. S. 479, 485; *Allen* v. *Massey*, 17 Wall. 351.

We understand counsel to contend that the deed contains certain provisions which must so hinder, delay and defraud creditors that fraud in its execution is to be conclusively presumed without regard to the intention of the parties.

The doctrine in Virginia, settled by a long and uninterrupted line of decision, is that, while there may be provisions in a deed of trust of such a character as of themselves to furnish evidence sufficient to justify the inference of a fraudulent intent, yet this cannot be so except where the inference is so absolutely irresistible as to preclude indulgence in any other. Hence provisions postponing the time of the sale and reserving the use of the property to the grantor meanwhile, though perishable and consumable in the use; permitting sales on credit; for the payment of surplus after satisfaction of creditors secured; the omission of a schedule or inventory; and the like, have been regarded as insufficient to justify the court in invalidating the deed for fraud in point of law. The fraudulent intent is held not to be presumed even under such circumstances, and in its absence the fact that creditors may be delayed or hindered is not of itself sufficient to vacate the instrument, while the right to prefer one creditor over another is thoroughly established. *Dance* v. *Seaman*, 11 Grattan, 778; *Brockenbrough* v. *Brockenbrough*, 31 Grattan, 580; *Young* v. *Wilson*, 82 Virginia, 291, 293.

When, then, it is claimed in this case that the deed is fraudulent in law, "because it appropriates partnership assets to pay individual debts in preference to the debts of the partnership," we should naturally expect to find that the Supreme Court of Appeals had held that where, as here, the conveyance included all the property of the grantors as partners and indi-

vidually, for the benefit of partnership and individual creditors, it should be construed distributively, and the partnership assets be applied to the payment of partnership debts and the individual assets to individual liabilities. And such is the fact. *McCullough* v. *Sommerville*, 8 Leigh, 415; *Gordon* v. *Cannon*, 18 Grattan, 388. And, as pointed out by Mr. Chief Justice Waite, the difficulty, at the time the assignment was made, attendant upon any attempt to separate the partnership and individual assets, and the partnership and individual debts, would be considered under the view of the state courts, in passing upon the question of intent to defraud in failing to specifically distinguish between them.

The only other ground of objection on this branch of the case relates to the following clause in the deed:

"And the said trustees, for the purpose of executing this trust, shall at once take charge of all the property and effects hereby conveyed, and make an inventory thereof, and proceed to collect the choses in action and all evidences of indebtedness, and to convert the real and personal property into cash as soon as possible, and they may make sale of the real and other personal estate hereby conveyed, at public auction or private sale, at such time or times and place or places and after such notice as to them shall seem best, and they may make such sale upon such terms and conditions as to them shall seem best, except that at any sale of said property, real or personal, at public auction, any creditor secured by this deed in the second class above enumerated shall have the right to purchase any part or parcel of said property so sold and pay the said trustees therefor at its full face value the amount found due such purchaser secured by this deed, or so much thereof as may be necessary to enable such creditor to complete the payment of his purchase money, and to enable as many creditors as possible to become bidders on these terms, the said trustee may have the real estate hereby conveyed, or any part thereof, laid off into lots or parcels, as they may think best. And upon the conversion of the said property hereby conveyed into money the said trustees shall distribute the same to the creditors hereby secured in the order herein

before named with all diligence, and in the distribution between those creditors who may have purchased property and paid for the same under the provisions of this deed with a part of the money found due them respectively, and those who made no purchase, the trustees shall observe such rule of equality as will be just and proper."

But can it be properly concluded that this provision is irreconcilable with any other inference than that of fraud? And even if so much of it as allows the creditors in the second class to bid and use their claims as purchase money were invalid, ought the whole instrument to be therefore declared of no effect? We agree with the Circuit Court that, as respects fraud in law as contradistinguished from fraud in fact, where that which is valid can be separated from that which is invalid, without defeating the general intent, the maxim, "void in part, void *in toto*," does not necessarily apply, and that the instrument may be sustained notwithstanding the invalidity of a particular provision. *Denny* v. *Bennett*, 128 U. S. 489, 496.; *Cunningham* v. *Norton*, 125 U. S. 77; *Muller* v. *Norton*, 132 U. S. 501; *Darling* v. *Rogers*, 22 Wend. 483; *Howell* v. *Edgar*, 3 Scammon, 417, 419.

Nor are we able, in view of the current of decisions in Virginia and all the terms of the deed taken together, to concur with the receiver's counsel that fraudulent intent is a necessary deduction from the permission to the creditors in the second class to avail themselves of their claims in bidding in the manner prescribed. The deed expressly stated that it was given to secure the costs and expenses, and then the payment of the indebtedness enumerated in the first class; "and *after* the payment of the hereinbefore mentioned sums and claims, to secure, secondly, the following creditors to be paid equally and ratably if the property hereby conveyed shall be insufficient to pay them all, but with the privilege as to bidding on such property as may be sold at auction as hereinafter provided." This contemplates the payment of the creditors in the first class before the bidding clause could take effect, and precludes the operation of that clause to the prejudice of those creditors. The record discloses that the total amount

secured in the first class was less than fifty thousand dollars, of which the bank held more than four-fifths, and that the cash assets were much more than enough to cover the costs and expenses and this amount, without any sales; so that the facts correspond with the intention deducible from the language of the deed. The first-class creditors are to be paid before the second-class creditors can exercise the right to bid if sales by public auction ever take place. The bank is a creditor in the first and second classes and the sole creditor in the third class, but it has no ground of complaint as a third-class creditor, as the operation of the clause can only be for its benefit as such.

The second-class creditors are all treated alike, and, as the counsel for the trustees says, are placed in exactly the same legal relation to the subject matter. If it could be said that the clause might operate to create a preference as between them, the grantors had a right to prefer; but inasmuch as each can bid, and the trustees have power to divide the property into parcels to enable as many creditors as possible to become bidders, and are charged with the duty to observe such rule of equality between those who purchase and those who do not, as will be just, it is not easy to see how a preference could be obtained. The question is not whether the trustees might prove unfaithful — a contingency of which there is no intimation here — but whether the provisions of the deed, if carried out according to their apparent intent, would be fraudulent in their operation. It seems to us, as it did to the Circuit Court, that such is not the reasonable inference, and that the manifest object was to stimulate bidding, prevent a sacrifice of the property, and benefit the creditors, and this without any advantage to the assignors other than that involved in having their assets go as far as possible in payment of their debts. It is not they who reap a pecuniary benefit, but their creditors.

Without further elaboration, we are of opinion that the deed is not void in law because of the insertion of the provision in question.

It should also be observed that the trustees are rendering

their reports under the direction of the court, and ask in their cross-bill "the aid and direction of this honorable court in the ascertainment of all and every the copartnership property and the individual property standing in the names of the individual members of the said copartnerships, or any of said members; and in the application of the trust funds to the payment of the debts secured; and in the administration of this their trust; and they are advised that it is their right and privilege to file this their bill, and to apply to this honorable court as a court of equity for the purpose aforesaid." So that the receiver, having invoked the interposition of a court of equity, can find there, either on his own application or that of his adversary, a remedy for any injurious results he may apprehend in the administration of the trust. The court will see to it that, as far as practicable, partnership assets are applied to partnership liabilities and individual assets to individual liabilities, and that the bidding clause shall not be put into operation unless in consonance with equity and good conscience.

It is earnestly argued, however, that the deed should be set aside because fraudulent in fact. We have patiently, but without success, examined this record in the effort to discover what specific acts are made out by the proofs establishing, in connection with the deed itself, actual fraud in its execution. The inquiry is not whether the grantors had been previously guilty of fraud or embezzlement, but whether this particular conveyance was made with a fraudulent intent known to the trustees or beneficiaries. *Evans* v. *Greenhow*, 15 Grattan, 153; *Emerson* v. *Senter*, 118 U. S. 1. It appears that the Bains were indebted to the bank and also to their depositors in several hundred thousand dollars. It is said that they indulged in wild speculations in real and personal estate, stocks, bonds, mines, railroads, etc.; but that applies as well to the squandering of the seven hundred thousand dollars and upwards of deposits with them as a banking firm, as it does to the money that they absorbed from the bank; and in any view, the violation of their fiduciary relations to the bank, of which they were officers, or their treatment of the depositors in the banking

firm of which they were members, does not render the assignment of all their property for the benefit of their creditors therefore fraudulent.

The bank and the banking house suspended on the second day of April, 1885, and the assignment was made on the sixth day of April. On the 31st day of March preceding, Bain & Bro. transferred to the bank certain securities of the estimated value of $570,000 in reduction of their indebtedness, and some other assets, as collateral to their guaranty of any deficiency which might result when the securities were realized on. When they transferred all their property, partnership and individual, of every kind, by the deed in controversy, they provided for the payment in the first instance of some $49,881.61, of which the bank held $42,288.49, and then for the payment in full, or ratably, of their own depositors, and certain notes aggregating $102,000, held by the bank; and they put the remaining indebtedness to the bank in a third class. They had a right to make preferences, and it is evident that their effort in the assignment was to equalize as between what they owed their own depositors and what they owed the bank, taking into consideration what the bank had already obtained. There was no fraud in this, of which the bank could complain as between it and the other creditors.

. . Counsel contends that the deed was in contravention of sections 5151 and 5234 of the Revised Statutes of the United States, which provide that the shareholders of every national banking association shall be held individually responsible for its debts to the extent of the amount of their stock, and, additional thereto, and that the Comptroller may enforce that individual liability. It is insisted that the capital stock is a trust fund of which the directors are the trustees, and that the creditors have a lien upon it in equity; that this applies to the liability upon the stock of a national bank; and that no general assignment of his property for the payment of his debts can lawfully be made by a shareholder, certainly not when he is a director. Undoubtedly unpaid subscriptions to stock are assets, and have frequently been treated by courts of equity as if impressed with a trust *sub modo,* in the sense that neither

the stockholders nor the corporation can misappropriate such subscriptions so far as creditors are concerned. *Richardson's Executor* v. *Green, ante,* 30, 44. Creditors have the same right to look to them as to anything else, and the same right to insist upon their payment as upon the payment of any other debt due to the corporation. The shareholder cannot transfer his shares when the corporation is failing, or manipulate a release therefrom, for the purpose of escaping his liability. And the principle is the same where the shares are paid up, but the shareholder is responsible in respect thereof to an equal additional amount. There was, however, no attempt here to avoid this liability, and the fact of its existence did not operate to fetter these assignors in the otherwise lawful disposition of their property for the benefit of their creditors.

Some other transactions are referred to in the bill as indicating fraud in fact, but they are not insisted upon in argument and require no special consideration. One of them relates to a deed of Wallace & Son to Bain & Bro., executed April 6, 1885, and referred to by counsel in another connection.

We think the Circuit Court was right in finding "no evidence whatever of any actual fraudulent intent on the part of the firm, or either of the partners, to hinder and delay their creditors."

The argument is pressed that the trustees were neither *bona fide* purchasers for value nor purchasers without notice, because they must have had knowledge, for the reasons given, of the previous conduct of Bain & Bro. But, as we have already seen, that previous conduct did not render the assignment in itself fraudulent, although it is quite true that all the circumstances should be taken into consideration in passing on that question. It is urged that the trustees knew that Bain & Bro. had no right to make the deed, because on the 31st of March, when they transferred to the bank certain stocks and bonds of the face value of $640,000 and an estimated value of $570,000, a member of the concern verbally promised that they would not make an assignment giving preferences against the bank. The transfer of these securities rendered the bank just so much better off, and counsel for the receiver concedes that

the advice of the bank's former counsel in regard to it, "in the condition of the affairs of the bank at that date . . . was wise and proper, and did secure to the bank whatever can be realized from the sale of the securities delivered under the agreement of March 31, 1885." The verbal promise not to make preferences constituted no lien upon Bain & Bro.'s property, and its disregard did not affect the validity of the deed. Nor is any issue in regard to it made upon the pleadings. It is noticeable that Bain & Bro. declined to incorporate that pledge in the written agreement transferring the securities, and we are not called upon to examine into the circumstances under which the promise so given failed to be carried out.

The receiver assigns for error that the Circuit Court held that he was entitled to a surrender of such of the property which it was found had "actually been purchased with the moneys of the bank as he elects to take, but of no other." In other words, it is insisted that the receiver is entitled to a charge upon the entire mass of the estate, with priority over the other creditors of Bain & Bro.

It was said by Mr. Justice Bradley in *Frelinghuysen* v. *Nugent*, 36 Fed. Rep. 229, 239 : " Formerly the equitable right of following misapplied money or other property into the hands of the parties receiving it depended upon the ability of identifying it ; the equity attaching only to the very property misapplied. This right was first extended to the proceeds of the property, namely, to that which was procured in place of it by exchange, purchase, or sale. But if it became confused with other property of the same kind, so as not to be distinguishable, without any fault on the part of the possessor, the equity was lost. Finally, however, it has been held as the better doctrine that confusion does not destroy the equity entirely, but converts it into a charge upon the entire mass, giving to the party injured by the unlawful diversion a priority of right over the other creditors of the possessor. This is as far as the rule has been carried. The difficulty of sustaining the claim in the present case is, that it does not appear that the goods claimed — that is to say, the stock on hand, finished and unfinished —were either in whole or in part the proceeds of any money unlaw-

fully abstracted from the bank." The same difficulty presents itself here, and while the rule laid down by Mr. Justice Bradley has been recognized and applied by this court, *National Bank* v. *Insurance Company*, 104 U. S. 54, 67, and cases cited, yet, as stated by the Chief Justice, "purchases made and paid for out of the general mass cannot be claimed by the bank, unless it is shown that its own moneys then in the fund were appropriated for that purpose." And this the evidence fails to establish as to any other property than that designated in the decree, although it is claimed, on behalf of the receiver, that the sum of $105,000 due to the bank upon certain notes of Wallace & Son, which had been discounted by Bain & Bro., and which were rediscounted for the latter by the bank, should have been traced into certain property conveyed by Wallace & Son to Bain & Bro. The circumstances, so far as necessary to elucidate this claim, are as follows: Bain & Bro. owed the Richmond Cedar Works $31,885.71. The Exchange National Bank held the interest of Bain & Bro. in these works under the transfer of Bain & Bro. to the bank, of March 31, 1885. The Richmond Cedar Works owed the Exchange National Bank $140,000, upon which Wallace & Son were endorsers. Wallace & Son owed Bain & Bro. over $300,000. By a deed dated April 3, 1885, Wallace & Son conveyed certain property to the Richmond Cedar Works for $55,000, receiving in payment the Cedar Work's check on Bain & Bro. for $31,885.71, due from them to it, and the notes of the Cedar Works for the balance, which were turned over to Bain & Bro. By this transaction the indebtedness of Bain & Bro. to the Cedar Works was extinguished, and Wallace & Son's indebtedness to Bain & Bro. reduced by the sum of $55,000. This left Wallace & Son still debtors of Bain & Bro. to the extent of over $245,000, and on the 6th day of April, 1885, they executed a deed of their remaining property to Bain & Bro., for the expressed consideration of $151,800, which property has passed under the assignment in this case. None of this property, so far as appears, was purchased with the money of the bank, but counsel for the receiver contends that because Bain & Bro. had rediscounted the notes of Wallace and Son to the

amount of $105,000 at the bank, and because the deed of Wallace & Son to Bain & Bro. was in payment of their indebtedness to the latter, in whole or in part, therefore it ought to be held that the bank's money purchased Wallace & Son's property for the benefit of Bain & Bro. We do not understand that the bank was entitled to the assets of Bain & Bro.'s debtors, and can perceive no ground for holding that Bain & Bro., in receiving the deed from Wallace & Son, were purchasing property with the money of the bank.

This disposes of the errors assigned on behalf of the receiver, and leaves for consideration those assigned on behalf of the trustees upon their cross appeal. The principal contention is that it was error to decree that the receiver could take "such of the property hereinbefore set out and found to have been actually purchased with the moneys of the said bank as he elects to take; and by making said election and receiving such property the said receiver is not to be estopped from receiving the full benefit of the said deed of trust, or the provisions thereof, in favor of the Exchange National Bank." We do not concur in that view.

The doctrine of election rests upon the principle that he who seeks equity must do it, and means, as the term is ordinarily used, that where two inconsistent or alternative rights or claims are presented to the choice of a party, by a person who manifests the clear intention that he should not enjoy both, then he must accept or reject one or the other; and so, in other words, that one cannot take a benefit under an instrument and then repudiate it.

It cannot be assumed that there was an intention on the part of Bain & Bro. to dispose of that which was not theirs, or, even if they lawfully could, to cut the bank off from participating in the property assigned, in the order mentioned, by imposing the condition that the bank should purchase its share by parting with its own property; nor does any equitable implication to that effect arise. The other creditors cannot claim compensation for being deprived of what did not belong to Bain & Bro., or of anything transferred in lieu thereof. There existed no equity on their part which can be held to

estop the bank from receiving what may come to it under the assignment, and in doing so it will not occupy inconsistent positions. That it sought to have the deed set aside does not deprive it of its rights under it, upon the failure of its attack.

It was entirely competent for the court to adjust this matter upon equitable principles, and this it has done in its decree. Under the assignment the bank gets a preference of something over $42,000, and then ranks with other creditors to the extent of $102,000, while the balance of a very large indebtedness due to it is relegated to the third class; and it appears to be entirely just that it should have in addition the benefit of that which belongs to it, and to which the other creditors have no claim. And this, though amounting on its face to $149,372.21, we are informed by counsel for the trustees, has only an actual value of $20,177.18, to three items of which, amounting to $6840, the objection is made of failure of proof of their having been purchased with the bank's money.

We have examined the record with care, and are satisfied with the conclusion arrived at by the special master and the court as to these items, and shall not disturb the decree in that regard.

The trustees also demur to being held affected with notice as to the traced property, principally because the affairs of the debtors were in such a state as to render the task of disentanglement exceedingly onerous. As inquiry would have conducted the trustees to the same conclusion as that now reached, the fact that the conduct of the Bains rendered it difficult to accurately distinguish between one class of property and another, should not absolve them from the operation of the rule as to notice, if otherwise applicable.

While it is well settled in Virginia that the trustees and beneficiaries in a deed of trust to secure bona fide debts occupy the position of purchasers for a valuable consideration; *Wickham* v. *Lewis Martin*, 13 Gratt. 427; *Evans* v. *Greenhow*, 15 Gratt. 153, 156; *Kesner* v. *Trigg*, 98 U. S. 50, 53; yet they cannot hold with notice of the fraudulent intent of their grantor, or of the fraud rendering his title void. And it is equally well settled in the States of West Virginia and Virginia that notice

to the trustees is notice to the beneficiaries. *Fidelity Co.* v. *Shenandoah Valley Railroad*, Supreme Court of Appeals, West Virginia, February 25, 1889, 9 Southeastern Reporter, 181, 185; *Beverly* v. *Brooks*, 2 Leigh, 446; *French* v. *Loyal Co.*, 5 Leigh, 627, 641.

The knowledge of the situation possessed by Mr. Old, one of the trustees, who was the Bains' attorney at the time of the assignment, and by whom it was drawn, was quite comprehensive, and was obtained in such a manner and under such circumstances that he must be presumed to have communicated it. It was knowledge obtained in the particular transaction. *The Distilled Spirits*, 11 Wall. 356, 366. There can be no doubt, also, respecting the duty of the trustees to inquire as to the rights of the bank, and that they are chargeable with a knowledge of all the facts that inquiry would have disclosed.

The decree directs that the costs of the suit be paid out of the trust funds in the hands of the defendant trustees, and as we agree with the results arrived at by the Circuit Court, we are of opinion that this direction was correct. The decree will be in all things

*Affirmed.*

Mr. Justice Brewer was not a member of the court when this case was argued and took no part in its decision.