**PRUDENTIAL INS. CO. OF AMERICA v. NELSON.**

**In re CHICKAMAUGA TRUST CO.**

No. 7454.

Circuit Court of Appeals, Sixth Circuit.

May 3, 1938.

J. B. Sizer, of Chattanooga, Tenn. (J. B. Sizer and Sizer, Chambliss & Kefauver, all of Chattanooga, Tenn., on the brief), for appellant.

Charles S. Coffey, of Chattanooga, Tenn. (Charles S. Coffey, of Chattanooga, Tenn., on the brief), for appellee.

Before HICKS and SIMONS, Circuit Judges, and WEST, District Judge.

SIMONS, Circuit Judge.

The trustee in bankruptcy of the Chickamauga Trust Company sued to recover from the appellant on the ground that it was a voidable preference, a sum of money paid to it by the bankrupt within four months of adjudication, in diminution of the bankrupt's estate while the bankrupt was insolvent and under circumstances giving rise to a reasonable belief that it would effect a preference. From a decree adjudging the payment to have been preferential, ordering it set aside, and awarding the trustee full recovery with interest, the defendant appeals.

Why recovery was sought by bill in equity rather than in a suit at law does not appear. The alleged preferences were money payments of ascertained and definite amounts, and the bill discloses no facts that call for an accounting or other equitable relief. Such suits may ordinarily not be sustained in equity. Schoenthal v. Irving Trust Co., 287 U.S. 92, 95, 53 S.Ct. 50, 51; 77 L.Ed. 185. No question is, however, raised, nor was it raised below, as to the form of the action, and we raise none, since the defendant may undoubtedly waive the right to trial by jury. Reynes v. Dumont, 130 U.S. 354, 395, 9 S.Ct. 486, 32 L.Ed. 934; American Mills Co. v. American Surety Co., 260 U.S. 360, 363, 43 S.Ct. 149, 150, 67 L.Ed. 306. Whether such waiver is but of the right to have factual issues decided by a jury, or whether it extends to all procedural consequences of a law trial, including the conclusiveness of findings supported by evidence, we do not decide, interesting as the suggested problem may be.

For many years prior to its adjudication the bankrupt had represented the appellant in negotiating mortgages for it on both farm and urban real estate in a number of southern states. It also acted as its collection agent under written contracts requiring it to remit all collections of principal and interest at once to the appellant's home office, or as otherwise by it designated. In addition to representing the appellant, the bankrupt also placed loans for other insurance companies, and itself loaned money upon mortgages, selling to private investors certificates of interest with guaranty of full recovery in the event of foreclosure. Mortgaged property upon foreclosure would be bid in by the Southern Realty & Investment Corporation, a subsidiary, owned entirely by the bankrupt.

For two or three years prior to 1930 foreclosures had greatly increased, and there was steady decline in real estate values in the territory in which the bankrupt operated. To carry on its business and to meet its guaranty obligations, the bankrupt borrowed heavily from the banks, and this not proving adequate, it resorted also to the practice of double pledging its notes and mortgages, made possible by loose banking methods then in vogue, and also by withholding from the appellant collections which it was under obligation to promptly remit. When remittances began to fall off the appellant sent two special examiners to Chattanooga to check up on delinquent mortgages and to make a survey of the bankrupt's records. They found about $25,000 of collections withheld and the records of the bankrupt in an unsatisfactory condition. Their report resulted in a conference at Atlanta and instructions to the bankrupt to remit forthwith without waiting for checks from borrowers to clear on the understanding that the appellant would reimburse promptly for any that were dishonored. Notwithstanding this arrangement delinquencies steadily increased, and the condition found by the appellant's examiners was not corrected. In the meanwhile the appellant had received the bankrupt's balance sheet showing large overdrafts at its banks, without substantial liquid assets from which indebtedness could be liquidated, while its own investigators in the field became aware of the rapidly declining value of real estate in the area covered by its mortgages.

The situation reached a crisis some time in December. A loan to one Purcell had matured on September 22d. Receiving no remittance from the bankrupt on its account, the appellant demanded payment of the mortgagor, without response. On October 28th the bankrupt requested the appellant to send the Purcell papers for collection. On November 26th, having heard nothing further, the appellant again wrote Purcell threatening foreclosure. In response it was informed on December 3d that the Purcell loan had been paid in full on September 22d and that the mortgage had been canceled. The appellant wired the bankrupt for immediate remittance and explanation. The latter not being satisfactory, it sent its representative Fortier to Chattanooga to audit the bankrupt's account and assume full charge of collections and remittances.

Fortier arrived at the bankrupt's office on the 9th or 10th of December. After some conversation with its officers and employees, and a cursory examination of its records, he discovered delayed remittance reports aggregating $44,073.60. Although collections aggregating more than $115,000 additional had been made by the bankrupt, for which the appellant has now filed a general claim, Fortier's examination was not such as to disclose them. In response to his demand for checks to cover he was given three checks, one for $10,000 on the First National Bank of Chattanooga, one for $10,000 on the Hamilton National Bank of Chattanooga, and one for $24,073.60 on the Fidelity Union Trust Company of Newark, N. J. Although it was after banking hours, Fortier took the checks immediately to the American Trust & Banking Company, opened a new bank account, instructed the bank to clear the local checks at once and to send the Fidelity check direct rather than through the Clearing House so as to save a day in effecting collection. At the same time he took over all further collections on appellant's mortgages and ordered the closing of new mortgages on its behalf to be discontinued. The local checks were paid the next morning and represent the $20,000 here sought to be recovered as a preference. The Fidelity check was dishonored and its subsequent history is unimportant. It is important to note that Fortier made no inquiries of the local banks as to the bankrupt's condition, nor did he inform them of his own discoveries until after the local checks had cleared. December 16th a creditors' committee took charge of the bankrupt's affairs and commenced an examination of its books. A voluntary petition in bankruptcy was filed on December 31st, and adjudication followed immediately thereafter. The trustee estimates that dividends to unsecured creditors will not exceed 15 per cent.

The appellant seeks reversal upon the ground that none of the elements of a voidable preference specified in section 60 of the Bankruptcy Act, as amended, 11 U.S. C.A. § 96, are present in the challenged transfers. These elements are, (1) the insolvency of the debtor at the time of the transfers, (2) their effect in enabling the creditor to obtain a greater percentage of its debt than others of the same class, and (3) the existence of reasonable cause to believe they would effect a preference. The contention is further made that the money

sought to be recovered by the trustee constituted part of a trust fund, which though depleted was replenished by the bankrupt with its own funds with specific intention to make restoration.

That the bankrupt was insolvent at the time of the transfers is clearly established upon the record. The District Judge found that it was hopelessly so. It is true, of course, as commonly it is, that the book value of its assets exceeded liabilities, and that its officers entertained the hope that it would work out of its difficulties. But a fair appraisal of its property subsequently made in the light of the steady decline of realty values in 1930 and preceding years, the fact that over $400,000 of its book assets represented capital stock in and advancements to the Southern Realty Company supported only by equities of the latter in real estate of doubtful, value, and the untenable position to which the bankrupt had been driven by questionable practices in support of its credit structure, sufficiently demonstrates without further analysis of the evidence that it was clearly insolvent.

█ Nor is there escape from the conclusion that the payments if allowed to stand would permit the appellant to secure a greater percentage of its debt than would other creditors of the same class. It has filed a general claim for $115,000. It seeks to retain $20,000 already received in full payment of that much of its debt. Whether a creditor has received a preference is to be determined not by what the situation would have been if the debtor's assets had been liquidated and distributed at the time of the alleged preferential payment, but by the actual effect of the payment as determined when bankruptcy results. Palmer Clay Products Co. v. Brown, 297 U.S. 227, 229, 56 S.Ct. 450, 80 L.Ed. 655.

The appellant contends, however, that the assets of the bankrupt were not depleted by the payment of the checks drawn by the bankrupt upon the Hamilton and First National Banks, and this requires some consideration of the condition of its deposit accounts at the time the checks were drawn and paid. At the close of business on December 10th the bankrupt's balance in the Hamilton Bank was $1,274.96. To cover its check to Fortier it made a deposit upon the 11th of $10,200 by borrowing from the Hamilton Bank $2,700 on the mortgage of one Wilson, already pledged elsewhere, and $7,500 upon the mortgage of one Lee, to

whom no loan had yet been made, although his note and mortgage were in its possession. The Lee note and mortgage were subsequently cancelled in the state court. Its balance at the First National Bank on December 10th was $7,760.89. Deposits on December 11th aggregated $7,984.92, and withdrawals, including the $10,000 check to the appellant, left a balance of $1,923.16. Included in the items of deposit was a check of the bankrupt upon the Fidelity Union Trust Company, good when drawn but dishonored by Fidelity because it had in the meantime offset the bankrupt's bank balance against its liabilities.

█ It is therefore urged that since the bankrupt established its deposit balances with the Hamilton and First National Banks, not by money of its own, but by credits allowed to it by the depositaries upon the hypothecation in the one case of the notes and mortgages of Wilson and Lee, and in the other by a check upon Fidelity which was never paid with funds of the bankrupt, there was no depletion of assets, but a mere readjustment of its liabilities, for in the amount by which it reduced its debt to the appellant it increased its debt to the banks when the hypothecated securities were set aside and the Fidelity check was dishonored. It insists that if it had not paid the appellant the banks would in any event have had the right to offset deposit balances against the bankrupt's liabilities. The contention is unsound. The deposits were credited to the bankrupt, subject to its check and available to creditors unless and until the banks had set them off against liabilities. This was never done. A simple illustration will illuminate the point. Had the bankrupt withdrawn its deposits in cash upon checks to its own order and put the money in its safe, there can be no doubt that it would then have been available for pro rata distribution to creditors. Instead, it paid it to the appellant. It was an equivalent withdrawal, for in either case it was beyond the reach of the banks and unavailable to them as an offset. The payments reduced the assets of the bankrupt available to creditors, and while the banks might have exercised a right of set-off if the money were still there (New York County National Bank v. Massey, 192 U.S. 138, 24 S.Ct. 199, 48 L.Ed. 380), yet, since it was not, their right to do so in other circumstances becomes unimportant. In re National Lumber Co., 3 Cir., 212 F. 928.

■■ Likewise must we reject the contention that the appellant had no reasonable cause to believe the bankrupt to be insolvent and that the payment would operate as a preference. While it is true that mere suspicion of insolvency or preferential effect is not enough to establish the voidability of a transfer, yet neither are circumstances which carry absolute conviction of insolvency the test of its infirmity. The statute condemns a transfer as preferential when the transferee has reasonable cause to believe that the transferor is insolvent and that it will effect a preference. It sets up a practical test, one with which courts are familiar and which in other transactions is frequently applied. If reasonable cause to believe a transferor insolvent and his transfer preferential in effect must wait upon complete audit and appraisal of a bankrupt's affairs, preferential transfers would rarely exist and the statutory protection to creditors be unavailing. Here were the signs which to a careful creditor pointed unerringly to a critical stage having been reached in its debtor's affairs. Remittances were delayed. Bank loans and over-drafts were increasing. The real estate market was steadily declining. Then comes the Purcell incident, with its unsatisfactory explanation. There follows Fortier's visit to the bankrupt's office. He was hurried there because an emergency appeared to exist. Even cursory examination disclosed delayed remittances. New business was stopped though in course of negotiation and checks demanded for old. Time was important. Fortier could not wait for the opening of the banks the day following but arranged for a deposit of the local checks after banking hours, with implicit instructions that they were to be cleared at once, and another check to be sent direct instead of through the usual clearing channels to avoid delay. He was careful to avoid suspicious inquiry until after the checks had cleared. The finding of the District Judge that these and other circumstances together considered satisfied the requirement of the statute that there was reasonable cause to believe the bankrupt to be insolvent, and that its transfer would effect a preference, will not be disturbed.

■ The payments to the appellant were not made out of trust funds. There was no segregation of collections made for the appellant, nor was such segregation required by the contracts. The extent of the bankrupt's contractual obligation was to promptly remit. It may be conceded that the collections when made were the funds of the appellant, but they were thereafter commingled with the bankrupt's funds, and that this was understood and acquiesced in by the appellant seems clear enough from the course of dealing between the parties and the absence of proof of any instruction that the funds were to be segregated. Granted that when so commingled trust funds may be followed into a joint account and recovered to the extent that they are still there, Lowell v. Brown, 1 Cir., 284 F. 936, 941; Brennan v. Tillinghast, 6 Cir., 201 F. 609; Peters v. Bain, 133 U.S. 670, 10 S.Ct. 354, 33 L.Ed. 696, and granted also that when a trust fund has once been reduced subsequent deposits of personal funds made not in the usual course of business but with a specific intention to restore the trust fund may also be recovered, yet the appellant's difficulty here is that the collections for Prudential have not been traced to the deposit in either the Hamilton or the First National Bank. The bankrupt had three and possibly four depositories for its funds. It made collections on its own account and for other mortgagees, and as pointed out in Lowell v. Brown, supra, it is not sufficient to prove that trust funds went into the general assets of an insolvent estate, it is indispensable to the maintenance of a claim to such funds by a cestui que trust that proof be made that they went into a specific fund. There is here no such proof. The appellant's funds not having been traced into its deposit accounts at the Hamilton or First National Banks, the question as to the bankrupt's intention to replenish the trust fund after its wrongful depletion become unimportant.

The decree below is sustained.