RUSSO-CHINESE BANK v. NATIONAL BANK OF COMMERCE OF
SEATTLE, WASH.†

(Circuit Court of Appeals, Ninth Circuit.   July 7, 1913.)

No. 2,182.

1. BANKS AND BANKING (§ 162*)—SPECIAL VERDICT—SUFFICIENCY OF EVI-
DENCE.

Plaintiff bank sued defendant bank to recover back money paid de-
fendant during the Russo-Japanese War as the proceeds of a draft sent
by defendant to plaintiff's Port Arthur branch for collection, on defend-
ant's assertion that it had been collected, during or just prior to the in-
vestment of Port Arthur, and not remitted, which plaintiff alleged was
not the fact, as was ascertained after the close of the war.   Defendant
alleged in the answer as an affirmative defense that the draft had been
collected by plaintiff's Port Arthur branch, and such issue was submitted
to the jury for a special verdict, which was returned in favor of defend-
ant.   Held, that there was sufficient evidence in the record to support such
verdict.

[Ed. Note.—For other cases, see Banks and Banking, Cent. Dig. §§ 562,
563, 565, 566; Dec. Dig. § 162.*]

2. BANKS AND BANKING (§ 162*)—COMPETENCY—COURSE OF DEALING.

On such issue, evidence of the course of dealing between plaintiff's
Port Arthur branch and the drawees of the draft, with respect to the
manner of payment of similar previous drafts, held competent.

[Ed. Note.—For other cases, see Banks and Banking, Cent. Dig. §§ 562,
563, 565, 566; Dec. Dig. § 162.*]

In Error to the District Court of the United States for the Western
Division of the Western District of Washington; C. H. Hanford,
Judge.

Action at law by the Russo-Chinese Bank against the National Bank
of Commerce of Seattle, Wash.   Judgment for defendant, and plaintiff
brings error.   Affirmed.

For former opinion, see 187 Fed. 80, 109 C. C. A. 398.

For a correct understanding of the present case it is necessary to make a
full statement of the facts, as was done when the case was first here. ·187
Fed. 80, 109 C. C. A. 398.   On the 10th day of December, 1903, the Cen-
tennial Mill Company, of Seattle, delivered to the Boston Steamship Com-
pany and Boston Towboat Company, at Seattle, 35,312 quarter sacks of
flour, for shipment by the steamship Hyades to Clarkson & Co. at Port Ar-
thur and/or Dalny in Manchuria.   The Centennial Mill Company received
from the steamship company its bill of lading in duplicate.   The bill of lad-
ing contained the following: "Received from Centennial Mill Co. * * *
for shipment at Seattle, by steamship Hyades * * * 35,312 Qr. Sax flour
* * * to be carried by said steamer or any other steamer of the above
company to the port of Port Arthur and/or Dalny * * * and to be there
delivered unto shipper's order or to his or their assigns.   (Notify Clarkson
& Co.)"

The flour had been sold to Clarkson & Co. at Port Arthur on terms of 90
days' draft, through the Russo-Chinese Bank, at $4.10 per barrel, amounting
to $36,194.80.   It appears that Clarkson & Co. were merchants at Port Ar-
thur engaged in buying and selling different kinds of goods.   They were
also agents at that place for different steamship companies, including the
Boston Steamship Company and the Boston Towboat Company, and were
therefore the agents of the steamship Hyades, which carried the 35,312 quar-
ter sacks of flour sold by the Centennial Mill Company to Clarkson & Co., to
be delivered to the latter at Port Arthur.   The Centennial Mill Company had

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes
† Rehearing granted October 20, 1913.

made other sales of flour to Clarkson & Co., which need not be referred to in this opinion. The Russo-Chinese Bank is a banking corporation existing under the laws of the Russian Empire, with its head office at St. Petersburg, and with numerous branches throughout the empire. At the dates referred to in this case it had a branch bank at Port Arthur, Manchuria, and another at Shanghai, China. In referring to either of these banks hereafter we shall designate it by its locality.

In accordance with the terms of the sale of the flour a draft was drawn by the Centennial Mill Company on Clarkson & Co. at Port Arthur for $36,194.80, with exchange and collection charges payable in 90 days after sight to the National Bank of Commerce, at Seattle. The Centennial Mill Company procured insurance on the flour with the Fireman's Fund Insurance Company of San Francisco in the sum of $40,000. The Centennial Mill Company thereupon took this draft on Clarkson & Co., the bill of lading issued to it by the steamship company for the flour, the insurance policy issued by the Fireman's Fund Insurance Company attached thereto, and delivered the same to the National Bank of Commerce at Seattle, with whom the Centennial Mill Company regularly transacted business, and, in accordance with the customary business usage, the bank discounted the draft, and paid the mill company the value thereof. Thereupon the bank sent the draft, with the other documents, by letter dated December 11, 1903, to the Port Arthur branch of the Russo-Chinese Bank for collection. The letter was received by the latter in due course of mail on January 22, 1904, according to the Gregorian, or "new style," calendar, or on January 9, 1904, according to the Julian, or "old style," calendar. The new style calendar prevails in this country; the old style in Russia. Under the latter the corresponding date is 13 days earlier than in this country. The dates referred to in this opinion will be according to the "new style" calendar in use in this country, and will involve a change of dates to that extent in documents issued and transactions had in Port Arthur. The letter with its inclosures, received by the Port Arthur branch of the Russo-Chinese Bank on January 22, 1904, from the National Bank of Commerce of Seattle, was acknowledged on the same date. In this letter of acknowledgment the Port Arthur bank called the attention of the Seattle bank to the fact that instructions were required as to the return of documents accompanying the draft, if the draft should be protested for nonacceptance or nonpayment. The letter states: "Please note: (1) That, unless otherwise instructed, bills of any description sent us for procuring acceptance and/or for collection will be protested both for nonacceptance or nonpayment and immediately returned to the sender. (2) When sending us for collection documents and bills or only documents clearly state in your letter accompanying same whether in case of dishonor: (a) Both bills and documents are to be promptly returned with the relative deed of protest, or (b) if the bill is to be returned and the relative documents are to be kept here at your disposal, or (c) if the goods are to be stored by us and fire insurance is to be recovered pending receipt of your instructions."

It does not appear that the Seattle bank ever furnished the Port Arthur bank any instructions with respect to the matters referred to in this letter. The Port Arthur bank presented the draft to Clarkson & Co. for acceptance on January 23, 1904. It was accepted by Clarkson & Co. on January 30, 1904, and on the same date the Port Arthur bank notified the Seattle bank by letter of the acceptance of the draft. The acceptance of the draft on January 30, 1904, fixed its maturity on April 30, 1904. On April 28, 1904, or two days before the maturity of this draft, the Port Arthur bank received a telegram from the Shanghai branch of the Russo-Chinese Bank, making inquiry concerning a reported sale of the flour by Clarkson & Co. without paying for it. The Port Arthur bank replied that the draft was due on the following day; that the fact that Clarkson & Co. had got possession of the flour through the bill of lading in the hands of the bank was due to Clarkson & Co. being the agents of the steamer carrying the flour, and could be in no way prevented by the bank. On April 30, 1904, the draft became due, but was not paid. Under the Russian law two days' grace are allowed in the matter of the payment of bills of exchange. At the expiration of this period of grace, on May 2, 1904, the Port Arthur Bank delivered the draft

to the notary public at Port Arthur for protest. On the following day, May 3, 1904, the draft was protested.

The Russo-Japanese War, formally declared February 10, 1904, was then in progress. The Japanese had been directing naval operations against the Russian naval base at Port Arthur from February 9, 1904, at which date a complete blockade of Port Arthur on the water side had been effected by the Japanese fleet. About May 3, 1904, it was completed by the Japanese military forces on land, and, when the deed and protest was received by the bank from the notary, communication between Port Arthur and the outside world had been completely ·cut off by the besieging forces of the Japanese army. The draft with the deed of protest was thereupon placed by the Port Arthur bank in its safe, to be kept until such time as communication should be restored. On January 2, 1905, the Japanese forces took possession of all the papers and documents belonging to the Russo-Chinese Bank at Port Arthur, and retained possession of them until March, 1906, when they were all returned to the Russo-Chinese Bank. While the books, papers, and effects of the Port Arthur bank were in the possession of the Japanese the bank had no access to them. When they were returned to the bank, they were taken to the home office of the principal bank at St. Petersburg.

Pending this situation of affairs at Port Arthur, the Seattle bank, on July 7, 1904, wrote to the St. Petersburg bank that Clarkson had advised the Centennial Mill Company that certain drafts on Clarkson & Co., including the one due on April 30, 1904, had been paid before maturity. To this letter the St. Petersburg bank replied, to the effect that it was unable at that time to correspond' with the Port Arthur bank, and was unable to trace the matter referred to, but, as soon as it was possible to investigate the subject, it would not fail to revert to it. These letters were followed by others passing between the two banks, in which the Seattle bank insisted that it had information that Clarkson & Co. had paid the amount of the draft to the Port Arthur bank, and demanding payment. The St. Petersburg bank repeated its former statement that communication with Port Arthur had been suspended, and it was unable to trace the matter. Finally, on October 12, 1904, the Seattle bank concluded a letter, upon the subject addressed to the St. Petersburg bank, with the following: "We· would respectfully request that you notify us immediately on receipt of this letter what you propose doing in the premises, and trust you will not by further delay compel us to take steps in this country to enforce our rights, which we most certainly shall do."

The St. Petersburg bank replied, under date of November 9, 1904, in which, after' referring to matters connected with the controversy, it said: "Of course, as the matter now stands, we are unable to discuss the question any further and therefore hand you inclosed, in cover of the bill for: U. S. $36,-194.80, claimed by you, check on Messrs. Ladenburg, Thalmann & Co.,· New York, for U. S. $36,013.70, as per note at foot, receipt of which kindly acknowledge. It remains of course however understood that in case your above remittance proves not to have been paid for by Clarkson & Co. you are held responsible to refund the amount of our to-day's check."

· The Seattle bank replied under date of December 5, 1904, acknowledging receipt of the draft for $36,013.70, but declining to accept that amount as full payment for the draft. In this letter the Seattle bank said: "The draft to this date would amount to G$38,312.19, leaving a balance due us of G$2,-298.49, which we would respectfully request that you remit us by return mail. We on our part agree upon return to us of both sets of bills, showing that the draft has not been paid, to reimburse you in the sum paid us, provided, that we were in no wise injured by the fact that your Port Arthur branch has indefinitely held the bills after their maturity, at which time they could have been returned to us and we could have collected from the steamship company."

· To this letter the St. Petersburg bank replied under date of December 29, 1904, inclosing check for the additional amount of $2,298.49, with this statement: "It remains understood that in case your above remittance proves not to have been paid. you declare yourselves ready to refund us these $2.298.49 with the $36,013.70 sent on 27/9 November, plus accrued interest." The Seattle ·bank under date of January 18, 1905, acknowledged the receipt of the check

for $2,298.49, with this guaranty: "We agree that guaranty contained in our letter of December 5 shall also cover this amount."

When the St. Petersburg bank received from the Japanese government the books and documents belonging to the Port Arthur bank, it was discovered after investigation, that Clarkson had not paid the draft of the Centennial Mill Company; that the draft upon Clarkson & Co. had been protested, and with deed of protest had been mailed to the Seattle bank on May 26, 1904. On June 27, 1906, the St. Petersburg bank wrote to the Seattle bank the result of this investigation, and asked that the two sums of $36,013.70 and $2,298.49, which it had paid to the Seattle bank with interest from the dates of remittances, be refunded to the St. Petersburg bank. After further correspondence between the banks, the Seattle bank refused to refund the money received from the St. Petersburg bank, and thereupon the latter brought this action at law to recover judgment against the Seattle bank for the two sums named.

In the complaint the facts relating to the controversy were alleged substantially as has been stated, with this further allegation relating to the repayment of the two sums of money paid by the St. Petersburg bank to the Seattle bank, namely, that the payments were made upon condition "that if it should thereafter be ascertained that said drafts had not been paid, the said sums should be repaid to it by the defendants, to which condition defendant assented and agreed in writing."

In an amended answer the Seattle bank admitted the sending of the draft drawn by the Centennial Mill Company upon Clarkson & Co. to the Port Arthur bank for collection, the receipt of the draft by the Port Arthur bank, but denied information as to the date of its receipt, or whether the draft was accepted by Clarkson & Co. or not. It admitted that during a portion of 1904 the empires of Russia and Japan were at war; alleged that the draft and protest were never returned to the defendant; admitted that it had represented to the plaintiff that the draft had been paid in full to the Port Arthur bank, that it had demanded payment of the amount of the draft in full, and that it had threatened to sue the plaintiff in the courts of the United States if the draft was not paid; that it had demanded the payment by the plaintiff to the defendant of the amounts stated in the complaint; but denied that the payments had been made upon condition that, if it should thereafter be ascertained that said draft had not been paid, the said sums should be repaid to the plaintiff; denied that the defendant agreed or assented in writing, or at all, to any such condition, but alleged that the defendant agreed upon its part, upon the return to the defendant of both sets of bills and a showing that the draft had not been paid, to reimburse the plaintiff with the sums paid to the defendant, provided that the defendant was in no way injured by the negligence of the plaintiff in connection with the collection of said draft, or in the performance of its duties, or in the handling of said draft or the documents connected therewith; alleged that no showing of nonpayment of said draft had ever been made, and that neither of said sets of bills, or any bill, had ever been returned to the defendant by the plaintiff covering the transaction referred to in the complaint, and that the plaintiff had never fulfilled or performed the conditions agreed upon by the plaintiff and defendant at the time the payments were made as alleged in the complaint.

Defendant alleged as an affirmative defense that the draft drawn by the Centennial Mill Company on Clarkson & Co. was paid in full, and plaintiff received such payment in full. Defendant further alleged as an affirmative defense that the flour represented by the bill of lading was appropriated by Clarkson & Co. to their own use, and the proceeds were not applied to the payment of such draft, and that the proceeds of the sale of the flour were not used and applied toward the payment of the draft; that the failure to have the same so applied toward the payment was due to the carelessness and negligence of the plaintiff, and was due to a breach of duty that the plaintiff owed to the defendant to cause said flour, or proceeds thereof, to be utilized for the payment of said draft; that the plaintiff did not protest the draft at the date of its maturity, and did not return the draft and the docu-

ments accompanying the same to the defendant, and all without cause or reason, to the great injury and damage to the defendant.

In plaintiff's reply it denied the agreement as to the condition of the payment made by the plaintiff, as alleged in defendant's answer, and denied any connection with or responsibility for the delivery of the flour to Clarkson & Co.

Upon the first trial of the cause in the court below, which was with a jury, the defendant thereto, upon the conclusion of the evidence on the part of the plaintiff, moved the court for a nonsuit on the ground that there had been a total failure of proof to sustain the complaint, which motion the trial court granted, on the ground that the action was based upon a contract in writing, and that the plaintiff had failed to prove the promise alleged in the complaint, and had failed to prove that the protested draft and accompanying documents had been returned to the defendant, as alleged in the defendant's answer. This court held that the complaint stated "a cause of action, upon an implied agreement to restore money paid to the defendant in error by the plaintiff in error under a mistake of fact, and that the evidence introduced on behalf of the plaintiff tended to sustain such a cause of action," and accordingly reversed the judgment and remanded the cause for a new trial. Upon the retrial the plaintiff introduced substantially the same evidence as on the former trial, and testimony was introduced on the part of the defendant; the last trial resulting in a general verdict for the defendant and a special verdict in response to a special issue submitted to the jury at the request of the plaintiff, as follows: "We, the jury in the above-entitled cause, find that the Port Arthur branch of the Russo-Chinese Bank did receive payment of the draft dated December 11, 1903, on account of which the plaintiff made the remittance to the defendant alleged in the complaint." Judgment followed in favor of the defendant, to which judgment the plaintiff sued out the present writ of error.

Warren Gregory and Chickering & Gregory, all of San Francisco, Cal., T. L. Stiles, of Tacoma, Wash., and Dorr & Hadley, of Seattle, Wash., for plaintiff in error.

Kerr & McCord, of Seattle, Wash., for defendant in error.

Before GILBERT, ROSS, and MORROW, Circuit Judges.

ROSS, Circuit Judge (after stating the facts as above). [1] It is manifest that if the special issue in response to which the special verdict was returned was supported by sufficient evidence, and there was no substantial error in the admission or rejection of evidence bearing on it, and the jury was not wrongly instructed in respect to that question, the judgment must be affirmed.

The record shows that the plaintiff in error requested the court to instruct the jury, among other things, as follows:

"In relation to the affirmative questions set up by the defendant, I advise you that they are as follows: (1) That the draft in question was placed by Clarkson & Co. with the plaintiff. In this connection I charge you that there is no evidence on the part of the defendant that this draft was so paid, either in whole or in part, and therefore this affirmative defense of the defendant must be disregarded by you. * * *"

The court refused to give the instruction, and submitted the issue to the jury, to which action the plaintiff reserved an exception, and its counsel here insist that "there is no evidence whatever that the draft was paid."

The record shows that the plaintiff in error's Port Arthur branch caused the draft to be protested, and the plaintiff introduced other evidence tending to show that it was not paid, but it is a mistake to say,

as does counsel for the plaintiff in error, that there is no evidence to the contrary. We find in the evidence of the defendant's witnesses Davidson and Short, and in that of Clarkson, as well as in the circumstances of the case, much evidence upon which the special verdict might well have been based. The record shows that there had been many other similar drafts, accompanied by similar documents, sent by the Seattle bank to the Port Arthur bank for flour sold by the Centennial Mill Company, and that the plaintiff bank was familiar with the business of Clarkson & Co., and indeed was mainly instrumental in the establishment of that firm at Port Arthur. Clarkson & Co. also had a place of business at Vladivostok, where its main office was; Davidson during most of the times in question being its manager at Port Arthur, and Short its assistant manager there, a Mr. Ofsiankin being during all of the times in question the manager of the plaintiff bank at Port Arthur, and subsequently, and at the time of the taking of the testimony in this case, being the manager of the Vladivostok branch of the plaintiff in error. The record shows that Clarkson & Co. were the agents of the steamship company that carried the flour in question from Seattle to Port Arthur, and were also importers, merchants, and insurance agents, and had one of the three warehouses at Port Arthur, all of which facts were well known to the Port Arthur bank. The flour in question was carried to Port Arthur by the ship Hyades, which reached there about the middle of January, 1904. The evidence also shows that Clarkson & Co. were large customers of the bank. The succeeding ship of the steamship company, also carrying flour among other things, reached Port Arthur about the 7th of February, 1904. Short testified, among other things, that when the Hyades arrived with the 35,312 quarter sacks of flour in question, there were but from 6,000 to 8,000 sacks in Clarkson & Co.'s warehouse, and that when that shipment arrived he went to the Port Arthur bank on behalf of Clarkson & Co. to accept the draft drawn for the purchase price of it, and did so; that when he accepted the draft Mr. Ofsiankin, on behalf of the bank, authorized Clarkson & Co. to take immediate possession of the flour and sell it, and that he (Short) on behalf of that firm gave the bank what he designates as a "letter of guaranty," and what Davidson in his deposition designates as one of "hypothecation," recognizing the flour as the property of the bank until paid for, and agreeing to pay over to the bank the proceeds thereof until full payment was made; that the letter was "the regular form of bank guaranty; it was a printed form," said the witness. And both Short and Davidson testified that what was done in the matter of the shipment here in question was in accordance with a long-established custom between the Port Arthur bank and Clarkson & Co.; Short testifying that:

"From the year 1900 the same rule existed. We always gave the bank a letter of guaranty against—a letter of guaranty to take delivery of the cargo, and the cargo belonged to them until it was paid for, and we sold it out and deposited the money in the bank from time to time as Clarkson & Co. got it in."

Davidson in his deposition corroborates the testimony of Short in that regard, and it is a most significant circumstance that, although it

appears from the evidence that, during the times it was being taken Mr. Ofsiankin was the manager of the plaintiff in error's bank at Vladivostok, he was not called to contradict the testimony of Short and Davidson; nor did the plaintiff in error produce the written agreement between the parties, delivered to the bank, according to the testimony of those witnesses, nor in any way account for it. Short testified that upon the acceptance by Clarkson & Co. of the draft in question, and the delivery by that firm to the Port Arthur bank of the documents mentioned, Clarkson & Co. took possession of the 35,312 quarter sacks of flour, and that they thereupon commenced selling it, and paying into the bank the proceeds thereof, is a fair inference from his testimony, as well as that of Davidson.

It appears from the latter's testimony that by reason of orders of the Russian military authorities he was compelled to leave Port Arthur, and did so on the 17th of February, 1904. Being asked on his direct examination when the last shipment of flour from the Centennial Mill Company to Clarkson & Co. arrived at Port Arthur, he answered that it arrived there about the 8th of February, 1904, but that he could not state positively, as he was not there at the time, and, being asked on what steamer that flour arrived at Port Arthur, answered, "On one of the steamers operated by the Boston Steamship Company or the Boston Towboat Company, either the Hyades or the Pleiades;" and, being asked as to the quantity of flour that arrived by the steamer so referred to by him, answered, "Between 35,000 and 40,000 sacks." In his subsequent testimony on both direct and cross examination the witness was evidently quite confident that the steamer that brought that flour was the Pleiades, but the flour itself, the witness distinctly testified, was sold by him before leaving Port Arthur to the firm of Ginsburg & Co., which he testified was a large Russian firm doing an extensive business with the Port Arthur bank, and with its principal place of business at that place, and which sale he testified he had to make in order to protect Clarkson & Co. against the war conditions then prevailing. His testimony is, in part, that he arranged with Ginsburg & Co. to pay a part of the money for which he sold the flour into the Port Arthur bank, and to take a draft from that company on Shanghai in his favor, which he intended to pay into Clarkson & Co.'s branch at that place, and that he took the head of the firm, Ginsburg, to the Port Arthur bank, and explained to the manager of that bank the terms of the sale, to which he agreed.

Short testified that the Pleiades arrived at Port Arthur about the 7th of February, and that he himself left there on board of that vessel, and that not more than 1,500 or 2,000 sacks of flour were landed at Port Arthur from that ship, so that the jury might well have concluded that the 35,000 or 40,000 sacks of flour which Davidson thought were brought by the Pleiades was the consignment of flour that the Hyades carried to that port a few weeks before. As a matter of course that, and all other inconsistencies in the testimony of the various witnesses, as well as their veracity, were matters for the determination of the jury, in the light of all of the facts and circumstances of the case. Moreover, there was testimony tending to show that

from the 1st of January, 1904, to November 23d of the same year, Clarkson & Co. paid into the Port Arthur bank 126,928 rubles and 97 kopeks.

We are of opinion that we would not be justified in holding that there was no evidence to sustain the special finding of the jury to the effect that the amount of the draft in question was paid to the Port Arthur bank.

[2] We are also of opinion that upon the issue of payment proof as to the course of dealing between the Port Arthur bank and Clarkson & Co., with respect to similar previous drafts between the same parties, was competent, and therefore that there was no error in the ruling of the trial court in respect to the admission of such testimony; and, finding no error in the instructions of the court upon the question of payment, the judgment must be affirmed, regardless of other questions elaborately and ably argued by counsel for the plaintiff in error, since they are immaterial in view of the special verdict.

The judgment is affirmed.