### NYSSA–ARCADIA DRAINAGE DIST. v. FIRST NAT. BANK OF VALE et al.

(District Court, D. Oregon. January 12, 1925.)

**1. Bills and notes ⬤⇒195—Counties ⬤⇒167—General indorsement carries title to paper.**

General indorsement for transmission of checks and county certificates of indebtedness carries title, and transmittee becomes owner.

**2. Bills and notes ⬤⇒200—Counties ⬤⇒167—Paper indorsed "for collection," "for account," etc., remains property of indorser.**

Checks and certificates of indebtedness indorsed "for collection," "for collection only," "for account," and for "collection and returns," remain property of indorser.

**3. Banks and banking ⬤⇒156—Indorsement for "collection and returns" creates relation of principal and agent; indorsement "collection and credit" indicates relation of debtor and creditor.**

Draft transmitted for "collection and returns" creates relation of principal and agent, and within itself is not declaration of trust respecting funds involved, but indorsement for "collection and credit" indicates relation of debtor and creditor.

**4. Evidence ⬤⇒450(10)—Indorsement "for collection and { credit / returns }" held ambiguous requiring extraneous proof.**

Indorsement of checks "for collection and { credit / returns }" is ambiguous, but in view of further advice not to remit until actually paid, and, a possible custom existing between banks concerned, ambiguity may be susceptible of satisfactory interpretation.

**5. Trusts ⬤⇒353—Rule as to tracing misapplied funds stated.**

Where insolvent has misapplied funds intrusted to it, which have been impounded for distribution to insolvent's creditors, it is not necessary that such funds be actually identified to give owner priority over other creditors, but it is necessary only to show that such funds were commingled and went to swell impounded assets.

**6. Banks and banking ⬤⇒80(8)—Payment of certificates of indebtedness and checks sent to insolvent bank for collection by check on such bank held not to entitle owner to priority.**

Where certificates of indebtedness and checks sent to insolvent bank for collection were paid by checks on such bank, there was mere shifting of bank's liability, bank's funds not being increased or decreased thereby, and owner of such certificates and checks was not entitled to priority over other creditors.

**7. Banks and banking ⬤⇒80(8)—Owners of checks sent to insolvent bank for collection resulting in balance against bank held not entitled to priority.**

Checks sent to insolvent bank for collection, which after being cleared in usual way resulted in balance against insolvent bank in favor of drawee bank, did not increase funds of insolvent bank and did not entitle owners of checks to priority over other creditors.

**8. Banks and banking ⬤⇒80(8)—Owners of checks sent to insolvent bank for collection resulting in increasing bank's assets held entitled to priority.**

Where checks sent to insolvent bank for collection, on being cleared, resulted in balance in bank's favor, which was paid by draft, and draft was credited to collecting bank by bank on which drawn, its funds were increased by amount of such balance, entitling owners of checks to priority over other creditors.

At Law. Action by the Nyssa-Arcadia Drainage District against the First National Bank of Vale and another. On motion for judgment on pleadings. Motion denied.

Gallagher & Kester, of Ontario, Or., for plaintiff.

C. M. Crandall, of Vale, Or., for defendants.

WOLVERTON, District Judge. The First National Bank of Vale (which, for convenience, will be called the Vale Bank), becoming insolvent, closed its doors October 24, 1921, and in due course Ray T. Moe

was appointed receiver by the Comptroller of Currency.

At and prior to the dates and times hereinafter mentioned, the First National Bank of Idaho had in its possession for collection the following checks and certificates of indebtedness:

Check of date October 17, 1921, drawn by C. C. Mueller, county treasurer, on Farmers' & Stockgrowers' Bank of Vale, Or., payable to the order of Bank of Nyssa, for $2,000.

Two checks of date October 19, 1921, drawn by Robt. D. Lytle, on the Stockgrowers' Bank, payable to order of Allen-Wright Company, one for $20 and one for $30.

Check of date October 17, 1921, drawn by S. Humphrey on the Stockgrowers' Bank, payable to order of Handy & Sebern, for $85.50, of which First National Bank of Hagerman, Idaho, was the owner.

Check of date October, 1921, drawn by O. W. Propst on the Stockgrowers' Bank, for $50.07, of which Pioneer Tent & Awning Company was the owner.

Check of date October 15, 1921, drawn by Vale Drug Store on the Stockgrowers' Bank, for $35.98, of which J. Weil Company was the owner.

Certificate of C. C. Mueller, treasurer of Malheur county, of date October, 1921, for the sum of $761.79, held for school district No. 46.

Certificate of C. C. Mueller, treasurer, of date October, 1921, for the sum of $141.-28, held for school district No. 73.

All of which checks and certificates were forwarded by the Idaho bank, on October 19, 1921, to the Vale bank, and, it is alleged, for collection and remission of the proceeds.

The check for $2,000 contains on the reverse side the general indorsement for transmission. So of the checks for $20, $30, $85.50, and $35.98. The certificate for $761.79 contains the bank's indorsement "for collection only." It does not appear how the other check and certificate were indorsed.

By the answer, it is shown that the advice accompanying the transmittal of the checks for $2,000, $85.50, $50.07, and $35.-98 was "for collection and $\left\{ \begin{array}{l} \text{returns} \\ \text{credit} \end{array} \right.$;" that accompanying certificate for $761.79, "for collection," and checks for $30 and $20, "for collection and credit"; and that the item of $141.28 consisted of three certificates, for $24.37, $83.42, and $33.49, respectively, which were "for collection." Each of these items contains, on the reverse side, the indorsement of the Idaho bank "for collection only." As part of the advice "for collection," in each instance, is a direction as follows: "Do not credit or remit until actually paid. * * * Deliver documents only on payment."

All these items were collected by the Vale bank, and the complaint alleges that it turned the entire fund over to the receiver, but that the same is due to plaintiff, less the costs and charges of collection, not exceeding $3.30. A claim was presented to the receiver for the amount, as preferred, but was disallowed.

The defendants' admit by their answer that the officers of the Vale bank, at all times prior to October 24, 1921, represented to plaintiff and the public that the bank was solvent and able to meet its financial demands and obligations. On the other hand, plaintiff alleges that the officers and agents of the bank knew of its insolvent condition, but concealed the same from plaintiff and the public, and thus fraudulently induced plaintiff to deal with such bank. This may be conceded for present purposes.

The matters presented for decision arise upon the record, through motion for judgment on the pleadings, namely, the bill and answer.

We may as well attend, first, to the legal effect of the indorsement of the checks and the advice attending their transmission by the Idaho bank to the Vale bank for disposition by the latter bank.

[1, 2] It is plain that a general indorsement for transmission of the paper carries the title, and the transmittee becomes the owner. But an indorsement "for collection," and especially "for collection only" does not have that effect. The paper remains the property of the indorser. A meaning must be ascribed to the words "for collection," and as intended by the indorser. They have the significance of a warning that, contrary to the effect of a general indorsement, it is not the purpose to transfer ownership. Sweeney v. Easter, 1 Wall. 166, 173, 17 L. Ed. 681; Commercial Bank of Penn. v. Armstrong, 148 U. S. 50, 13 S. Ct. 533, 37 L. Ed. 363; 3 Am. & Eng. Enc. of Law, 815.

Nor does indorsement "for account" purport to transfer the title of the paper, or the ownership of the money when received. White v. National Bank, 102 U. S. 658, 661, 26 L. Ed. 250.

[3, 4] So, of a draft transmitted for "collection and returns," the relationship of the parties concerned is that of principal and agent, and within itself is not the declaration of a trust respecting the funds involved. Anheuser-Busch Brewing Ass'n v. Clayton, 56 F. 759, 6 C. C. A. 108. On the other hand, it must be conceded an indorsement for collection and credit in indicative of a relationship of debtor and creditor.

Now, analyzing these checks and certificates, with reference to their indorsement and the attendant advice in transmission, the title of the paper passed, without question, in three instances only, namely, the $35.98 check, which was by general indorsement, and the $30 and $20 checks, which were for collection and credit. Title assuredly did not pass as to the two certificates, the indorsements being for "collection" and "collection only." The indorsement of the remaining paper, being checks for $2,000, $85.50, and $50.07, which is "for collection and $\left\{\begin{array}{l}\text{returns,}\\\text{credit}\end{array}\right.$" is obviously ambiguous. No one can say, without extraneous evidence, what was intended. In view of the further advice not to remit until actually paid, and a possible usage and custom, existing at the time and previously, between the banks concerned relative to their dealing with one another as to such matters, the ambiguity might be susceptible of satisfactory interpretation. Commercial Bank of Penn. v. Armstrong, supra; Beal v. Nat. Exch. Bank, 55 F. 894, 5 C. C. A. 304; Russo-Chinese Bank v. National Bank of Commerce, 206 F. 646, 124 C. C. A. 434; Charles Hing v. Joe Lee, 37 Cal. App. 313, 174 P. 356.

[5] The doctrine now firmly established is that, where there has been a wrongful appropriation by an insolvent concern of moneys or funds intrusted to it, which have been impounded in due course in the hands of a trustee or receiver for administration and distribution among creditors, and recovery of the fund so wrongfully appropriated is sought, it is no longer necessary for recovery that the selfsame property or funds be identified among the mass of assets impounded, but the test now is: Did the misappropriation, in the manner of treatment in acquiring possession and control, go to swell the general mass of assets? The modification and final settlement of the doctrine is stated with perspicacity by Bradley, Justice, in Frelinghuysen v. Nugent (C. C.) 36 F. 229, 239, and has the approval of the Supreme Court in Peters v. Bain, 133 U. S. 670, 693, 10 S. Ct. 354, 361 (33 L. Ed. 696), as follows:

"Formerly the equitable right of following misapplied money or other property into the hands of the parties receiving it depended upon the ability of identifying it; the equity attaching only to the very property misapplied. This right was first extended to the proceeds of the property, namely, to that which was procured in place of it by exchange, purchase, or sale. But if it became confused with other property of the same kind, so as not to be distinguishable, without any fault on the part of the possessor, the equity was lost. Finally, however, it has been held as the better doctrine that confusion does not destroy the equity entirely, but converts it into a charge upon the entire mass, giving to the party injured by the unlawful diversion a priority of right over the other creditors of the possessor."

For elaborate discussion of the rule, see further National Bank v. Insurance Co., 104 U. S. 54, 26 L. Ed. 693.

The doctrine, however, does not relieve or obviate the necessity of tracing the property or fund, whatever its original or changed form, into the impounded assets, and of showing that it was commingled with such assets and became a part and parcel thereof, thus adding to and enlarging the general mass; otherwise there can be no equity in a preference claim above the general creditors.

[6, 7] The answer shows, and, in view of the motion for judgment on the pleadings, it must be taken as true, that, as to the C. C. Mueller certificate for $761.79, Mueller had in the Vale bank, credited to his account and subject to his check, a sum larger than the amount of such certificate, and that the amount thereof was paid by drawing his check therefor upon the bank, which amount was charged to his account, and the certificate satisfied; that, as to the certificate for $141.28, it was satisfied in like manner; that as to the checks for $2,000, $35.98, and $50.07, respectively, they were mingled with other checks drawn on the Farmers' & Stockgrowers' Bank of Vale, Or., and the whole cleared in the usual manner with said bank, with the result that a balance was found in favor of the Vale bank and against the Stockgrowers' Bank, for which balance a draft was made and delivered in payment, and the same remitted to and credited by the American National Bank of Pendleton to the account of the Vale bank, October 22, 1921; that the same

thing happened respecting the checks of $20 and $30, respectively, except with the result that a small balance was found in favor of the Stockgrowers' Bank; also with respect to the check of $85.50, except with the result that a balance was found in favor of the Stockgrowers' Bank in the sum of $678.08, for which a draft was drawn and delivered by the Vale bank to the Stockgrowers' Bank in payment. This last transaction was had during banking hours on October 24th, and before the bank closed. After November 20, 1921, there was paid to the receiver by the American National Bank of Pendleton the sum of $1,709.24, being the balance due from said bank to the Vale bank. There came into the hands of the receiver cash in the amount of $1,118.70, in addition to the sum above named.

As it pertains to the two certificates, the funds for which they stand are not susceptible of cognizance as swelling the general mass of funds within the bank's coffers. The identical inquiry was disposed of in American Can Co. v. Williams, 178 F. 420, 101 C. C. A. 634 (Second Circuit). The court classified the drafts, as to their method of collection and manner of payment, as follows:

"(1) Drafts paid by the drawees' check on outside banks made payable to the Fredonia Bank and subsequently paid by such outside banks directly to the defendant as receiver. (2) Drafts paid by the drawees' checks on outside banks made payable to the Fredonia Bank and paid by the former to the latter before the appointment of the receiver. (3) Drafts paid by the drawees out of their accounts as depositors of the Fredonia Bank, the amounts thereof being charged against such accounts. (4) Drafts paid by the drawees' checks on outside banks made payable to the Fredonia Bank and indorsed and delivered by it to the Merchants' Exchange National Bank in New York City, and credited by such bank to the Fredonia Bank."

As a premise to its decision respecting the thought of tracing the funds into the hands of the bank that failed, the court observes:

"The relation of cestui que trust and trustee undoubtedly existed between the plaintiff and the Fredonia Bank. The bank violated every duty which it owed the plaintiff. The proceeds of the plaintiff's drafts held by it or its agents constituted trust funds which might be followed into the hands of the receiver if they could be traced."

The same observation may be conceded as applicable here for the purposes of our present inquiry, except as the indorsement and advice attending the transmission of the checks indicate a different status. The court found no difficulty in following the proceeds of drafts within the first class; nor as respects a small balance of $77.23, found in the Columbia Bank to the credit of the Fredonia Bank at the time of failure, which was referable to the fourth classification. No allowance was made in pursuance of the third classification, nor under the second.

As respects the third classification, Anheuser-Busch Brewing Ass'n v. Clayton, supra, is also in point. There the association drew its draft on one P. H. Morris, and sent it to the McNab Bank, the institution that failed, for "collection and returns." Morris paid the draft with his check on the McNab Bank, wherein he had more than sufficient funds at the time to meet the check. The McNab Bank forwarded to the association its exchange drawn on the Hanover National Bank of New York, which, being sent forward to the latter bank for payment, was protested; the McNab Bank having failed in the meantime. The McNab Bank was insolvent at the time Morris paid the association's draft, and the exchange was drawn on the Hanover Bank and sent forward by the association for payment, but was engaged in business as a going concern, and later suspended. While the McNab Bank was largely indebted to the Hanover Bank, it had a line of credit with it, and all drafts drawn on it by the McNab Bank were paid down to and including the date of the latter's suspension. The court made its deduction as follows:

"Accepting Morris' check in payment of his debt to appellant (the association), and charging the amount of it on Morris' account by the bank, was but a shifting of its liability, whereby it became appellant's debtor, and assumed the obligation to pay to it the amount of the check less exchange. There is nothing to indicate that this amount was separated and kept unmingled with the bank's own money; but, on the contrary, it is conceded that it is undistinguishable from the mass of the bank's own money, and cannot be traced to and identified in the hands of the receiver. This being so, appellant has no better equity than the other creditors of the bank, and is entitled to no priority over them."

The payment of the certificates by Mueller with his checks drawn against his own account with the Vale bank was but a shift-

ing of liability on the part of the bank, and neither increased nor diminished the general mass of funds in the bank.

A like result would be the case as respects the $20 and $30 checks through clearance with the Stockgrowers' Bank. So of the $85.50 check, though the clearance showed a balance in favor of the Stockgrowers' Bank for $678.08.

[8] A very different situation is presented by the clearance with the Stockgrowers' Bank as respects the checks for $2,000, $35.98, and $50.07, aggregating $2,086.05. There a balance was found due the Vale bank, for which a draft was given, and the same remitted to the Pendleton bank and placed to the credit of the Vale bank, which latter bank at the time of its suspension had a credit with the former of $1,709.24, which amount was paid to the receiver. It would seem evident that the funds of the Vale bank were increased by the amount of the Stockgrowers' draft remitted to the Pendleton bank. This is traceable, and should be readily identified through the books of the Vale bank. Clark Sparks & Sons Mule & Horse Co. v. American Nat. Bank et al. (D. C.) 230 F. 738. That the draft was remitted to the Pendleton bank renders the situation no different than if the amount of the draft had been paid in money to the Vale bank, unless it be that subsequent transactions with the Pendleton bank alter the case.

From the foregoing conclusions, it is plain that the matters pertaining to the style of the advice attending the remittance of the $2,000, $35.98, and $50.07 checks, and the amount by which the funds of the Vale bank were increased through receipt of the draft from the Stockgrowers' Bank remitted to the Pendleton bank, are not solvable on the face of the pleadings, and therefore that the motion should be denied.

So ordered.