**ST. AUGUSTINE. PAINT CO. v. McNAIR.**

District Court, S. D. Florida, Jacksonville
Division.

June 17, 1932.

M. L. Stephens, of St. Augustine, Fla.,
for plaintiff.

Frank D. Upchurch, of St. Augustine,
Fla., for defendant.

STRUM, District Judge.

This is a suit in equity to establish and
recover a preferred claim against the receiver
of the insolvent First National Bank of St.
Augustine.

At about 10 o'clock a. m., on July 24, 1929,
plaintiff made two deposits in said bank. The
first consisted of a check in amount of $2,-
290.57, drawn by plaintiff on another bank in
the same city, the St. Augustine National,
payable to plaintiff and indorsed in blank for
deposit in the First National. The purpose
of this deposit was to move certain of plain-
tiff's funds from the St. Augustine National
to the First National in order to open an ac-
count in the latter bank. The second de-
posit, made a few minutes after the first, con-
sisted of cash in amount of $18.32, and a
check for $56.05; the latter drawn by a third
party on the First National, the bank of de-
posit, payable to plaintiff. Both deposits
were credited on plaintiff's passbook, but
were not entered on the bank's ledger prior to
the bank's closing. The deposits were laid
aside in the receiving teller's cage, and were
thereafter dealt with as hereafter stated pur-
suant to instructions from the president of
the bank.

756

Shortly after 10 o'clock on the same day, the president of the First National, knowing that heavy withdrawals had already occurred, and that other withdrawal demands, which the bank could not meet, were imminent, called an immediate meeting of the board of directors. The meeting convened at about 10:30 a. m., adjourned at approximately 11 a. m., and the bank suspended business at 11:34 a. m. pursuant to a resolution passed by the board. Approximately an hour intervened between plaintiff's deposits and the passage of the directors' resolution which ordered the bank's suspension.

The directors further resolved that all deposits made with the bank that morning should be segregated in special funds, and that such deposits should not be entered upon the books of the bank.

Shortly after plaintiff deposited the $2,290.57 check drawn on the St. Augustine National, and at about 10:30 a. m., an employee of the First National, wishing to use the check in the morning's clearing with the drawee bank, converted plaintiff's check into cash by taking from the general funds of the First National an equivalent amount of cash, and placing it, together with plaintiff's deposit slip, in a large envelope marked with plaintiff's name. This, of course, was prior to the First National's suspension. After plaintiff's check was thus converted into cash, the employee added the check to the regular morning's clearing with the St. Augustine National, to which latter bank the check was immediately presented and by it honored as a part of the clearing between the two banks. The purpose of this maneuver is obvious. The First National wished to use plaintiff's check in its clearing with the St. Augustine National so as to reduce by the amount of that check any balance in favor of the St. Augustine National which might develop at the clearing; yet it wished to leave plaintiff's deposit intact, segregated, and identified. So the bank pursued the method just stated to acquire plaintiff's check for the purpose of using it in the clearing. The clearing resulted against the First National; that bank paying the St. Augustine National $2,385.95 out of the general funds of the former, in order to balance accounts.

When plaintiff's second deposit was made, a few minutes after the first, the cash and check constituting the same, together with the deposit and credit slips relating thereto, were placed in the same envelope which contained the cash substituted for the check first deposited, after which the envelope marked with plaintiff's name was laid aside in the receiving teller's cage.

The envelope, with its contents, came into the receiver's hands intact. Thereafter, the $56.05 check was by the receiver charged to the account of the drawer and credited to plaintiff's account.

When the bank closed, it had on hand cash in amount of $28,502.35.

Plaintiff's contention is that the bank accepted plaintiff's deposits when the bank's officers knew it to be hopelessly and irretrievably insolvent, a condition unknown to the plaintiff, thereby committing a fraud which constituted the bank a trustee ex maleficio for the plaintiff, entitling plaintiff to rescission and restitution.

That the president of this bank knew it to be hopelessly insolvent when plaintiff's deposits were made is convincingly shown by the evidence. Even if the president entertained a hope when the meeting of the board of directors was called that the bank might survive, there was no rational basis for such a belief. The president acknowledged that he had no plan to carry on when he called the directors' meeting, and that he "knew the bank was getting pretty low" for several days before it closed. He knew that the bank's assets to the extent of approximately $300,000 were invested in the stock of a building corporation which owned the bank building, the market value of which building had so sharply declined as to leave little, if any, equity above a mortgage in amount of approximately $200,000 to which the building was subject, by reason whereof the value of the stock in the building company, substantially all of which was held by the bank, was of doubtful value, if any, as a bank asset. The president knew that the withdrawals from the bank from July 1st to date of closing, a period of twenty-four days, were approximately $650,000. He knew of one demand which came in the morning's mail of July 24th for $15,000, and others for $25,000 to $30,000, which the bank would not be able to meet; the cash then in the bank being not more than $29,000. He knew that a substantial number of depositors were withdrawing their deposits and converting the proceeds into bonds. He knew that the bank's account with a New York correspondent bank was $17,000 overdrawn, and that the latter bank would deal further with the First National only on a cash basis. The First National had on deposit with other banks certain funds which it proposed to transfer to cover this latter overdraft, but these funds

were not sufficient for that purpose, and the transfer was never made.

When plaintiff's deposits were made it must have been clear to the president of the First National that suspension was imminent and inevitable. Such condition appeared to be evident to the directors when they met at 10:30 o'clock that day, for their action was prompt and decisive. It is therefore held that, when plaintiff's deposits were made, the bank was hopelessly insolvent, known to be so by its president, and that plaintiff was unaware of that condition.

■ It is now well settled that a bank which accepts deposits when it is hopelessly insolvent, and that condition is actually known to the bank's officers but is unknown to the depositor, commits a fraud on the depositor for which he may rescind the contract of deposit and either recover the deposit or its proceeds, or impress the assets of the bank with a trust for the amount thereof. Notwithstanding the depositor's intention to make a general deposit, such fraud on the part of the bank vitiates the implied contract from which the relationship of debtor and creditor usually arises. Title to plaintiff's deposits therefore never passed to the bank. The relation of debtor and creditor never arose. The relationship was that of trustee and cestui que trust. Richardson v. New Orleans Deb. Co. (C. C. A.) 102 F. 780, 52 L. R. A. 67; Western German Bank v. Norvell (C. C. A.) 134 F. 724; Butler v. Western German Bank (C. C. A.) 159 F. 116; St. Louis & S. F. Ry. Co. v. Johnston, 133 U. S. 566, 10 S. Ct. 390, 33 L. Ed. 683; Byrd v. Ross (D. C.) 58 F.(2d) 377; Brennan v. Tillinghast (C. C. A.) 201 F. 609; Quin v. Earle (C. C.) 95 F. 728; Frelinghuysen v. Nugent (C. C.) 36 F. 229, cited approvingly in Peters v. Bain, 133 U. S. 670, 10 S. Ct. 354, 33 L. Ed. 696; Wasson v. Hawkins (C. C.) 59 F. 233; Walker v. McNeil, 68 Fla. 181, 66 So. 994; 7 C. J. 730.

■ Now, does the necessary tracing and augmentation appear so as to charge the receiver with the trust to which the deposits were subject in the hands of the bank? To constitute the requisite augmentation, it is not essential that the assets of the bank itself be swelled by money from outside sources. City of Miami v. First Nat'l Bank of St. Petersburg, Fla. (C. C. A. 5) 58 F.(2d) 561.

To charge the receiver it must appear that funds which the bank held as agent or trustee reached the receiver's hands in some form, and that the assets brought under the receiv-

er's control were larger by that amount than they would otherwise have been. Bryan v. Cocoanut Grove Bank & Trust Co., 101 Fla. 947, 132 So. 481; Western German Bank v. Norvell (C. C. A.) 134 F. 724; Butler v. Western German Bank (C. C. A.) 159 F. 116. A tracing of credits, as distinguished from a mere shifting of entries on the books of the bank, will suffice as an augmentation. Jefferson Standard Life Ins. Co. v. Wisdom (C. C. A. 5) 58 F.(2d) 565. This is not a case of mere shifting of credits such as was involved in Blakey v. Brinson (opinion filed May 16, 1932) 52 S. Ct. 516, 76 L. Ed. ——.

■ Title to the cash deposit in amount of $18.32 remained in the plaintiff because of the bank's fraud. This money clearly passed into the receiver's hands intact, segregated from the bank's assets, and to that extent augmented the funds passing to the receiver. Furber v. Stephens (C. C.) 35 F. 17; Massey v. Fisher (C. C.) 62 F. 958. The specific money was identified, though such identification is no longer essential. City of Miami v. First National Bank (C. C. A. 5) 58 F.(2d) 561; Western German Bank v. Norvell (C. C. A.) 134 F. 724; Butler v. Western German Bank (C. C. A.) 159 F. 116.

■ As to the $2,290.57 check: If the check itself had remained in the hands of the bank, plaintiff could have recovered it from the receiver. Subject to the requirements of tracing and augmentation, plaintiff can likewise recover the proceeds of the check. While the bank was still managing its own affairs, it voluntarily converted that check into cash from its general funds. It desired, and took, the check to use for its own purposes, but first substituted cash for it, and marked that cash with plaintiff's name. By thus cashing the check, the bank, in effect, bought it. When the money was substituted for the check and segregated as stated, the bank lost title to the money, but acquired title to the check; the money being placed in the same status theretofore occupied by the check. This voluntary action of the bank left the matter as if plaintiff had originally deposited cash instead of the check. The bank, thus having become the owner of the check, then used the same to pay its own debts to the St. Augustine National in the clearing transaction. This conversion of the check into cash and segregation of such cash from the bank's general assets before using the check are of vital consequence, as those facts distinguish that transaction from those in which a bank of deposit merely credited a check to the depositor's account so as to be-

come the depositor's debtor, and thereafter used the check to pay the bank's own debts in such manner that the proceeds were absorbed in a clearing transaction with no gain to the receiver, such as in Empire State Surety Co. v. Carroll County, Iowa (C. C. A.) 194 F. 593; Farmers' Bank v. Pribble (C. C. A.) 15 F.(2d) 175; Larabee Flour Mills v. First National Bank (C. C. A.) 13 F.(2d) 330; Nyssa-Arcadia Drainage Dist. v. First National Bank (D. C.) 3 F.(2d) 648; Mechanics & Metals Bank v. Buchannan (C. C. A.) 12 F.(2d) 891; Spokane County, Wash., v. First National Bank (C. C. A.) 68 F. 979.

The fact cannot be ignored that the bank voluntarily converted plaintiff's check into cash and segregated such cash as a special fund, and that this cash, segregated and labeled, passed intact to the receiver. As between plaintiff and the bank, the proceeds of plaintiff's check is the money which the bank voluntarily substituted for the check so that the bank might lawfully acquire the check to use for its own purposes. Originally, the bank acquired no title to the check; its title being acquired through purchase as already stated. By substituting the money for the check, and segregating the money marked with plaintiff's name, the bank did not become plaintiff's debtor. It remained a trustee as to the proceeds [Dixon v. Hopkins (C. C. A.) 56 F.(2d) 783], so that the money, like the check, became a special fund, to which neither the bank nor the receiver gained title. This special fund, impressed with a trust in favor of the plaintiff, came into the receiver's hands intact, augmenting to that extent the assets in the hands of the receiver.

In principle, this case is identical with the recent Fifth circuit case of City of Miami v. First National Bank, 58 F.(2d) 561, though there is a difference in the manner in which the special funds involved came into existence. Here, however, as in the case last cited, the bank held a special fund in trust for a depositor, which fund was traced into, and augmented, the assets passing to the receiver. In the City of Miami Case, supra, as in this case, the moneys which formed the special fund came from within the failed bank. No new money came from outside sources. See, also, Davis v. McNair (C. C. A.) 48 F.(2d) 494; Western German Bank v. Norvell, supra. The plaintiff is therefore entitled to recover from the receiver the proceeds of the $2,290.57 check.

It is held in Washington Shoe Mfg. Co. v. Duke, 126 Wash. 510, 218 P. 232, 37 A. L. R.

611, that a mere segregation of a deposit intended to be general is not sufficient to convert the deposit into a special one, the bank not being hopelessly insolvent at the time. Here, however, the deposit becomes special, not because of the segregation alone, but because of the bank's fraud.

As to the check in amount of $56.05, however, there was no augmentation. This check, drawn on the First National Bank, constituted merely an order on the bank of deposit to transfer funds from one account to another in that bank, from which would result no more than a change of creditors on the part of the drawee bank, and even that was not accomplished before the bank closed, the check not having been charged against the drawer's account. The assets coming into the hands of the receiver were not increased thereby, and therefore plaintiff has no equity as to this sum. Perth Amboy v. Middlesex, 60 N. J. Eq. 84, 45 A. 704; Ellerbe v. Studebaker Corp. (C. C. A.) 21 F.(2d) 993; Larabee Flour Mills v. First National Bank (C. C. A.) 13 F.(2d) 330; Beard v. Independent Dist. of Pella City, Iowa (C. C. A.) 88 F. 375; Empire State Surety Co. v. Carroll County, Iowa (C. C. A.) 194 F. 593, 606.

A decree will therefore be entered awarding plaintiff a preferential recovery as to the said sums of $18.32 and $2,290.57, but denying, without prejudice, the relief prayed as to the $56.05 check.