Louis GELBMAN, as Trustee of the Estate of Kiddie Korrell Shoppe, Inc., Bankrupt, Plaintiff,

v.

The CANTON NATIONAL BANK, Defendant.

Civ. A. No. 31353.

United States District Court
N. D. Ohio, E. D.

May 10, 1957.

Murray A. Nadler, Youngstown, Ohio, for plaintiff.

Edgar W. Jones, C. A. Morgan, Jr., Amerman, McHenry, Jones & Morgan, Canton, Ohio, for defendant.

WEICK, District Judge.

This action was brought by the trustee in bankruptcy to set aside an alleged preferential transfer made within four months of bankruptcy, which consisted of a payment of $6,000 made by the debtor to the Canton National Bank on an unsecured promissory note.

The parties are in agreement that the only questions to be determined by the Court are:

(1) Was the debtor insolvent on the date of payment, namely, on September 15, 1953?

(2) Did the bank have reasonable cause to believe that the debtor was then insolvent?

The debtor was an Ohio corporation and had three stores located in shopping centers in Canton, Niles and Warren, Ohio where it was engaged in the retail sale of children's clothing. The Canton store was opened in September 1952, Niles in March 1953 and Warren in the latter part of May 1953.

On May 5, 1953 the debtor borrowed $10,000 from the bank and to evidence the loan executed and delivered its promissory note payable in 90 days. It deposited with the bank as security a new $10,000 policy of life insurance on the life of its president, on which only one premium had been paid, and a subordination agreement with respect to non-current loans which had been made to it by its stockholders. It also furnished the bank with a balance sheet and an income and surplus statement as of February 28, 1953 prepared by an auditor which showed the debtor was then solvent. No security was given to the bank other than the life insurance policy which was of little value. The bank's records indicated that the loan was to be reviewed at maturity when a new balance sheet and profit and loss statement would be obtained.

At maturity, namely on August 4, 1953, the debtor paid $4,000 in cash to the bank on the indebtedness and wanted to renew the loan for an additional 90 days. The bank, however, renewed the loan for only 30 days because the debtor had not furnished it with a new balance sheet and profit and loss statement which was contemplated when the loan was originally made.

On September 15th the debtor paid the bank $6,000 in full payment of the renewal note and secured a surrender of the note. It is this payment which the trustee in bankruptcy questioned and seeks to recover from the bank in the present action.

The debtor was adjudicated a bankrupt on an involuntary petition in bankruptcy filed in this Court on December 17, 1953.

The evidence shows beyond any doubt that the debtor was insolvent on September 15, 1953. An auditor, who had been employed at various times by the debtor, testified that on December 3, 1956 he prepared a balance sheet as of August 31, 1953 from the debtor's books and records which showed liabilities of $61,736.34 and assets of only $18,986.31. He had previously prepared another statement on or about October 10, 1953 without audit, which showed assets of $26,343.76 and liabilities of $52,318 as of September 30, 1953. The schedules filed in the bankruptcy court showed assets of $11,542.80 and liabilities of $55,483.-47.

While no financial statement was prepared for the critical date of September 15, 1953, this was unnecessary because the statement as of August 31, 1953 showed liabilities in excess of assets in the amount of $42,750.03 and in the absence of any evidence as to improvement in the 15 day period which followed, or thereafter, it may be fairly inferred that the condition of insolvency existing on August 31, 1953 continued to the date of bankruptcy, when the company had an excess of liabilities over assets in the amount of $55,483.37. I, therefore, find that the debtor was insolvent on September 15, 1953.

The question as to whether the bank had reasonable cause to believe that the debtor was insolvent presents a more difficult problem.

The debtor was engaged in a new venture, and was undercapitalized for the equipping, stocking and operating of three stores. This is apparent from the fact that its shareholders had made loans to it totalling $19,746.48 which the bank required to be subordinated in its favor as part of the consideration for making the loan. An additional loan of $20,000 from shareholders was contemplated for the new stores which were being opened in Niles and Warren. There is no evidence that this additional loan from shareholders was ever made.

The debtor had purchased seasonal merchandise in anticipation of the opening of two of its new stores in February, but the stores were not completed until

March for Canton and May for Warren. The result was that the debtor was compelled to sell merchandise out of season at substantial discounts and in some instances at 50% of cost. This information was given to the bank prior to the payment in question.

The losses sustained from operations up to September 30, 1953 amounted to over $38,000 which included $8,500 for the month of September alone.

On July 13, 1953 the debtor sold its Canton store to Kidstuff, Inc. and sustained a loss of $12,109.33 from the sale. The bank learned of the sale prior to September 15th.

The debtor opened a checking account with the bank on April 27, 1953 which was quite active until the following July, when the activity materially slackened and the account was overdrawn by the writing of checks without sufficient funds for their payment. The bank, of course, knew about these "N.S.F." checks as under bank procedures the matter was brought to the attention of its officers. The unpaid checks were returned to the payees.

An overdraft of $1,446.51 existed in the account on July 23, 1953. On the following day a deposit of $2,083.42 was made, but because of outstanding checks the account was still overdrawn by $519.-51, which overdraft was not restored until July 29th.

On August 25th the balance in the checking account was only $5.15.

No deposits were made in the checking account for a period of nearly a month, namely, from August 20th until September 15th which is the critical date.

The payment made by the debtor to the bank in the amount of $4,000 on August 4th, at the maturity of the original loan, was in the form of cash.

Mr. Rose, the president of the debtor, testified that he did not deposit the receipts from the stores in the checking account at the bank for fear of attachment by creditors and that he was accumulating cash to pay on the bank loan.

He wrote creditors sending partial payments and requesting additional time for the payment of debtor's indebtedness.

The $6,000 payment to the bank on September 15, 1953 was composed of $4,000 cash and a $2,000 check of Kidstuff, Inc., the purchaser of the Canton store.

The Vice President of the bank had made inquiry of the debtor's auditor and president concerning the sale of the Canton store and testified that he was "perturbed" when the information he requested was not forthcoming and the bank's $6,000 note was not due.

The bank received a letter from another bank dated September 3, 1953 inquiring as to the credit standing of the debtor but delayed answering it until September 15th which was the date of the questioned payment. In its answer to the letter, the bank stated that the debtor had maintained decent balances in its account "until several months ago and since that time some checks have been returned for not sufficient funds."

Summarizing the above circumstances:

Undercapitalization of the debtor. Sales of merchandise below cost and heavy losses sustained in the operation of the business.

Checks drawn on debtor's checking account without having sufficient funds for payment resulting in overdrawing the account.

Delay of the debtor in making good the overdrafts.

Inactivity of the checking account including the failure of debtor to make any deposits therein for nearly a month.

Sale of the Canton store in the city where the bank was located and the failure of the debtor to furnish information to the bank relative thereto in response to the request by the bank.

Payments on the loan made by the debtor to the bank of sizeable amounts in the form of cash. The debtor accumulated the cash and did not deposit it in the checking account for fear of sequestration by creditors.

Failure to secure financial statement of the debtor at maturity of original loan or any time thereafter although such statement was contemplated at time of original loan.

The bank's delay in answering an inquiry from another bank as to debtor's credit standing and its answering such inquiry on the day the questioned payment was made.

Mere suspicion of insolvency is insufficient to put a person on inquiry. Grant v. National Bank, 97 U.S. 80, 24 L.Ed. 971. On the other hand, the trustee in bankruptcy was not required to prove that the bank had actual knowledge of the insolvency of the debtor. This would impose an almost impossible burden.

The trustee was merely required to prove that the bank had reasonable cause to believe that the debtor was insolvent. This may be done by circumstantial as well as by direct evidence.

In Prudential Insurance Company of America v. Nelson, 6 Cir., 96 F.2d 487, 491, Judge Simons said:

"Likewise must we reject the contention that the appellant had no reasonable cause to believe the bankrupt to be insolvent and that the payment would operate as a preference. While it is true that mere suspicion of insolvency or preferential effect is not enough to establish the voidability of a transfer, yet neither are circumstances which carry absolute conviction of insolvency the test of its infirmity. The statute condemns a transfer as preferential when the transferee has reasonable cause to believe that the transferor is insolvent and that it will effect a preference. It sets up a practical test, one with which courts are familiar and which in other transacactions is frequently applied. If reasonable cause to believe a transferor insolvent and his transfer preferential in effect must wait upon complete audit and appraisal of a bankrupt's affairs, preferential transfers would rarely exist and

the statutory protection to creditors be unavailing. Here were the signs which to a careful creditor pointed unerringly to a critical stage having been reached in its debtor's affairs."

While this case was decided prior to the amendment of the statute, signs were pointed out by Judge Simons which, like the circumstances in the case at bar, showed that there was reasonable cause to believe that the debtor was insolvent.

Where the circumstances are such as would lead an ordinary person to make inquiry, the creditor is chargeable with notice of all facts which a reasonable diligent inquiry would have revealed. Collier on Bankruptcy, 14th Ed., Vol. 3, § 60.53; Swanson & Sons Poultry Co. v. Wylie, 9 Cir., 1956, 237 F.2d 16; Essex National Bank of Haverhill, Mass. v. Hurley, 1 Cir., 16 F.2d 427.

Had such inquiry been made in the present case it would have revealed the debtor's state of insolvency.

The fact that the auditor did not know of the insolvency on September 15, 1953 does not help the bank. The debtor did not keep the auditor fully informed or furnish him with all the facts. When the auditor prepared the statements as of August 31 and September 30 he was then in possession of sufficient information to show that the debtor was hopelessly insolvent.

The president of the debtor had knowledge that his company was operating at a loss and was in serious financial difficulty. His course of conduct shows that and he testified that he informed the Vice President of the bank of the debtor's financial difficulties.

I find that the bank had reasonable cause to believe that the debtor was insolvent.

This memorandum is adopted as findings of fact and conclusions of law. Judgment may be entered in favor of plaintiff for $6,000 with interest from September 21, 1954.